CINDY McCAY, by Next Friend, GERALD McCAY, Appellant, v. B. G. MITCHELL, M.D., PAUL H. WILLIAMS, M.D., and JOHN R. WILLS, M.D., Appellees.—463 S.W.2d 710.

Western Section. June 15, 1970.

Certiorari Denied by Supreme Court February 16, 1971.

426

428

Robert R. Krivcher and James S. Cox, Memphis, for appellant.

Neely, Green & Fargarson, Memphis, for appellees.

MATHERNE, J. This is a medical malpractice lawsuit wherein the plaintiff Cindy McCoy, a five year old child at the time of the alleged tort, sued two orthopedic surgeons, Dr. B. G. Mitchell and Dr. Paul H. Williams, and a general practitioner, Dr. John R. Wills, claiming the negligence of these three doctors contributed to and caused the loss of plaintiff's left forearm.

At the close of plaintiff's proof in chief the Trial Judge directed a verdict in favor of the general practitioner Dr. John R. Wills. The jury rendered a verdict in favor of the two defendant orthopedic surgeons, and a judgment was entered dismissing plaintiff's lawsuit. The plaintiff has appealed to this Court listing twenty-six Assignments of Error. We deem it more expedient, after a brief review of the case, to individually consider these Assignments of Error, rather than to state at this point the many issues raised thereby.

On Saturday, June 9, 1972, at about 4:00 P.M. the plaintiff Cindy McCay fell from a swing and injured her left forearm. The obvious deformity of the arm prompted her parents to rush her to the Methodist Hospital in Memphis, Tennessee where they asked for their family physician the defendant Dr. John R. Wills. Dr. Wills instructed the hospital to call in Dr. B. G. Mitchell an orthopedic surgeon to whom he referred orthopedic cases. Dr. Mitchell came to the emergency room and took over the care of Cindy.

The hospital medical records signed by Dr. Mitchell reveal the diagnosis was a compound fracture of both

bones of the left forearm; the immediate treatment was a debridement and repair of the compound wound. The fracture was reduced by closed reduction, a plaster of paris splint and circular cast was applied to the left arm from half way between the elbow and shoulder down over the knuckles of the left hand.

The record reveals Cindy experienced pain with increasing intensity from the time she was discharged from the hospital on Sunday, June 10, 1962, until the pain stopped at about 3:00 A.M. on Thursday, June 14, 1962. Dr. Mitchell's day off is on each Thursday. On Wednesday night, June 13, 1962, the parents called for their physician, Dr. Mitchell, and were put in contact with the defendant Dr. Paul H. Williams, who advised them he was looking after Dr. Mitchell's patients. On the advice of Dr. Williams the parents took Cindy to his office on Thursday, June 14, 1962 at which time Dr. Williams removed the circular cast. The evidence conflicts as to whether he removed the splint and actually examined the left arm. The circular cast was replaced and Cindy was sent home. That afternoon Cindy became somewhat irrational and either Dr. Williams or the receptionist at his office advised the parents to take Cindy to their family physician, Dr. John R. Wills. The evidence conflicts as to why Cindy was referred to Dr. Wills, but she was taken to his office on Thursday afternoon, June 14, 1962. The next morning Cindy was taken to Dr. Mitchell, who had returned from his day off, and upon his seeing the blue color of Cindy's left hand and the swelling thereof he immediately removed the cast and had her admitted to the hospital. That afternoon vascular surgery was performed by Dr. J. C. Lougheed in an attempt to open the arteries to permit the flow of blood. The

operation was repeated on June 16th and 23rd. The operations were not successful and on June 25, 1962 Dr. Mitchell amputated the left forearm of Cindy McCay at a point just below the elbow.

It is not necessary to review in detail all the facts involved in the foregoing brief statement of the history of this unfortunate experience. The plaintiff insists the defendant doctors were negligent in permitting an infection to develop beneath the tight circular cast; this infection caused a swelling within the cast, which in turn shut off the supply of blood resulting in gangrene. The defendants contend the blood was shut off due to a vascular spasm in the left arm and not because of any infection. There was material evidence before the jury on both theories and the finding for the defendant doctors is supported thereby. This review is therefore limited to a review of errors allegedly committed by the Trial Judge which were prejudicial to the plaintiff and which the plaintiff insists constitute reversible error.

As to the condition of Cindy's left forearm on June 15, 1962, when the cast was removed by Dr. Mitchell, that doctor admitted gangrene was present in the arm on that date. Dr. J. C. Lougheed admitted on this date there was dead, rotten and necrotic muscle in the left forearm, and the left hand and arm up to the elbow were completely cyanotic. Dr. Lougheed also signed an official medical record which revealed when he opened the skin of the left forearm along the course of the radial artery a purulent necrotic material excruded from the underpressure. Both Dr. Mitchell and Dr. Lougheed testified the cause of the stoppage of blood in the left forearm was a vascular spasm.

■ Assignment of Error I raises the issue as to what extent the statement and admission of one doctor defendant would be binding on his doctor co-defendants not present at the time the statement was made. The Trial Judge held all such statements to be hearsay as to the doctor co-defendants not present at the time the statement was made and instructed the jury to apply that rule to all statements and admissions of each doctor made in the absence of any doctor co-defendant. The Trial Judge instructed the jury statements so made by a doctor defendant could be considered only as evidence against that defendant. Under the facts of this case we feel the Trial Court's rulings and instructions were too broad. As stated in Wigmore on Evidence, 3rd Ed., Vol. IV, sec. 1078 (1940), "This question, frequently enough a difficult one, depends upon the doctrine of Agency applied to the circumstances of the case, and not upon any rule of Evidence." See also: 29 Am.Jur.2d, Evidence, sec. 662, p. 712.

■ Other than in a partnership situation, the general rule is a physician who is unable to care for a patient may send a substitute to care for the patient, and no liability attaches for negligence of the substitute absent agency or negligence in the selection of the substitute. See cases annotated in 85 A.L.R.2d 889. See also: 41 Am.Jur., Physicians and Surgeons, sec 114, p. 226; 70 C.J.S. Physicians and Surgeons sec. 54d, p. 978. Assuming there was no negligence in the selection of Dr. Williams, the question remains as to when is the substitute doctor the agent of the employed doctor?

In Wilson v. Martin Memorial Hospital (1950) 232 N.C. 362, 61 S.E.2d 102, the plaintiff employed a Dr. Ashby for care during pregnancy and childbirth. When

birth pains began the plaintiff reported to the hospital and asked for Dr. Ashby as he had instructed her to do. Instead of Dr. Ashby responding to care for plaintiff, a Dr. Telle, whom the plaintiff did not know, came in her room and said Dr. Ashby had arranged for him to care for Dr. Ashby's patients. After considerable difficulty with labor an operation was performed by Dr. Telle in order to effect the delivery. There was evidence this surgery was negligently performed and the plaintiff was seriously injured thereby. The plaintiff sued Dr. Telle, Dr. Ashby and the hospital. The Court sustained the dismissal of plaintiff's suit as to the hospital, but remanded for a new trial as to Dr. Telle and Dr. Ashby. On the issue of the status of the parties the Court stated:

> "The plaintiff's evidence tends to show that Dr. Ashby, who had been engaged to treat the plaintiff professionally in her pregnancy and childbirth, was absent at the time she entered the hospital for her accouchement and that he arranged for the plaintiff to be under the care of Dr. Telle, previously unknown to the plaintiff, who thereafter treated her. This would seem to *permit the inference* that Dr. Ashby thereby constituted Dr. Telle his agent for the performance of the necessary services to the plaintiff which he had contracted to render. Nash v. Royster, 189 N.C. 408, 127 S.E. 356." (Emphasis supplied)

We agree with the rule as announced in the North Carolina case. Agency is a question of fact under the circumstances of the particular case; and whether an agency has been created is to be determined by the relation of the parties as they in fact exist under their agreement or acts. Smith v. Tennessee Coach Co. (1946) 183 Tenn. 676, 194 S.W.2d 867; Rich Printing Co. v. Mc-

Kellar's Estate (1959) 46 Tenn.App. 444, 330 S.W.2d 361; Rural Educational Ass'n. v. Bush (1956) 42 Tenn. App. 34, 298 S.W.2d 761; 2 Am.Jur., Agency, secs. 23, 24, pp. 25-28.

The record reveals the parents of the child did not know Dr. Paul Williams. They called the doctor's exchange in Memphis on Wednesday night to contact their physician, Dr. Mitchell. They were referred to Dr. Williams because Dr. Mitchell had left instructions to refer his patients to Dr. Williams. Dr. Williams gave the parents instructions over the telephone, told them to call him back if necessary, and to bring Cindy to his office the next morning. The parents took the child to Dr. Williams the next morning and he examined the arm as heretofore noted. Dr. Mitchell testified Dr. Williams was acting for him (Mitchell) when he treated Cindy McCay. Upon Dr. Mitchell returning to his duties on Friday, he again took over the care and treatment of the plaintiff. There is ample material evidence from which the jury could have concluded Dr. Williams was the agent of Dr. Mitchell, acting within the scope of his authority and for the benefit of his principal, while treating and caring for Cindy McCay.

█ We therefore hold the Trial Court erred in the instructions to the jury, and the situation presents a question of fact as to whether Dr. Williams was, or was not, the agent of Dr. Mitchell. In situations of this nature the jury should be instructed on the law of agency, and if they find the existence of a principal-agent relationship then the rules applicable to that relationship would be applied as to any statement, admission, or act of the agent. Assignment of Error I is therefore sustained.

Assignment of Error II complains of the Trial Court's action in sustaining an objection to the reading of a question and answer from the pretrial discovery deposition of Dr. Mitchell. The question and answer excluded were:

"Q. Dr. Mitchell, did Mr. McKay ever suggest to you that he thought that the cast which had been applied to the left forearm of Cindy McKay was you that he thought that the cast which had been applied to the left forearm of Cindy McKay was in any way responsible for the loss of his daughter's arm?

A. About the only thing that Mr. McKay ever said to me about this particular business, and it seems rather ironical that he would say it—I recall two things that he said. The first thing that Mr. McKay said to me when we arrived back in the room after setting the child's arm, and it was a rather grotesque deformity of the forearm the first thing that Mr. McKay said to me that I thought was rather ironical was, 'Doctor, is she going to lose her arm?' Quite naturally, I think one would suppose that in the normal practice of orthopedic surgery, never having seen anything like this, and from the simple type of fracture which she had sustained, my immediate suggestion to him was, that if no infection resulted as a result of this compound fracture, I would evpect her to have a normal arm. The other thing that Mr. McKay said to me on a Friday morning in the hospital was to the effect—and he said this repeatedly, and he never expanded or enlarged upon it—was that had I been there and seen this child on Thurs-

day, we might never have progressed to that point. This was said to me, and I think probably in criticism of Dr. Williams, and again I thought it was somewhat ironical that this man would say that when I had treated his child, I had seen his child on every occasion except on one occasion, and yet that he would be inclined to put the blame for all of her problems on this man who had seen her for me. I felt that this was an unfair and unjustified position that he had taken, and I so informed him. Other than that, Mr. McKay suggested possibly that the cast was the cause. I don't know that he ever suggested to me that the cast was too tight. I think that he suggested that the cast was the cause of this thing, and so I don't recall when in the course of treatment, or when in the course of treating this child that this was said, I don't recall him ever saying anything to me about the cast prior to Friday. At some time or another after that, I do remember us discussing plaster casts, methods of application, and I went through a whole gamut of things with Mr. McKay about plaster, swelling, what happens after a fracture, and I tried my best to explain in detail to him every single thing about this case involving his daughter.''

The objection sustained to this testimony was that at the time the deposition was taken there was another lawsuit by Mr. McCay against Dr. Mitchell filed after the statute of limitations had barred the action, in which case it was alleged Dr. Mitchell fraudulently concealed the cause of action from Mr. McCay and the testimony

was admissible under those allegations in that suit, but was irrelevant and immaterial to the present lawsuit.

■ In the present lawsuit the defendants stress the fact that they had no reason to suspect infection in the left arm of Cindy McCay. The conversation between Mr. McCay and Dr. Mitchell tends to establish Dr. Mitchell was of the opinion the arm would be all right if no infection resulted from the compound fracture. The statement admits the existence of a compound fracture which was a hotly contested question of fact in the lawsuit. This would tend to aid the jury in determining whether Doctor Mitchell used the proper degree of care in the treatment of the arm when there was material evidence from which the jury could find an infection did in fact develop in the left arm of Cindy McCay. We hold the testimony admissible as having some bearing on the issues of the lawsuit as contemplated by T.C.A. 24-1204 and 24-1208. Assignment of Error II is sustained.

Assignment of Error III presents the issue of whether the pre-trial discovery deposition of a party, taken before the deponent was made a party to the suit, may be introduced by the opposing party under the rules governing the introduction of the deposition of a party, or must such a deposition be introduced under the rules governing the deposition of a witness.

Defendant, Dr. John R. Wills, gave a pretrial discovery deposition at a time when he was not a party defendant to this lawsuit. After he was made a party defendant Dr. Wills gave another pre-trial discovery deposition. The former deposition was made an exhibit to the latter deposition. At the trial the plaintiff apparently intended to read as proof in chief portions of

the first deposition given when Dr. Wills was a witness. The Trial Judge sustained the defendant's objection to the reading by the plaintiff of any portion of the deposition of Dr. Wills taken when he was a witness; disallowed the reading of any portion of the second deposition which referred to the first deposition; and disallowed the filing of the first deposition which had been made an exhibit to the second deposition. The Trial Judge applied the rules governing the introduction of the deposition of a witness, and excluded the testimony because Dr. Wills was present and available to testify. T.C.A. 24-1208.

 It is true Dr. Wills was available to testify. However, we think the relationship of the parties at the time of the trial should govern the introduction of pre-trial discovery depositions, rather than their relationship at the time the deposition was taken. We deem this rule more wholesome than to hold the taking of the deposition of a potential witness will give to that witness as a party some advantage which otherwise he would not possess.

 We therefore hold where a party to the lawsuit at time of trial has previously given a pre-trial discovery deposition, taken under the provisions of The Deposition Act of 1959 (T.C.A. 24-1201 thru 24-1219), that deposition may be introduced by the opposing party at the trial without regard to whether the deponent was, or was not, a party to the lawsuit at the time the deposition was taken, and the rules governing the introduction of such a deposition will be those rules by statute made applicable to the deposition of a party. Assignment of Error III is sustained.

Assignment of Error IV complains of the Trial Judge's refusal to allow Dr. Richard Chodoff to testify

on behalf of plaintiff as to the standards of care and skill required of orthopedic surgeons and general practitioners in Memphis, Tennessee. Dr. Chodoff is duly licensed to practice medicine in the State of Pennsylvania, and is not qualified as an orthopedic surgeon. Dr. Chodoff had never practiced medicine in Memphis, Tennessee, and his testimony as to the standards of care and skill was offered on the basis of his having attended numerous medical meetings, and having studied many medical papers; and his familiarity with the works of many eminent physicians and surgeons in various fields of medicine. The plaintiff insists the uniformity of curricula in medical schools, the modern efficient dissemination of medical information among doctors, and the modern uniformity of standards over the entire nation permits a relaxing of the "locality" rule, and a physician qualified to practice medicine in one locality would be competent to testify as to the standards of care and skill required of physicians in any other locality.

■ To qualify as an expert witness in a malpractice action, it must appear he is familiar with the treatment and care and skill of practitioners in the locality in question. Quinley v. Cocke (1946) 183 Tenn. 428, 192 S.W.2d 992, citing: 32 C.J.S. Evidence sec. 537, p. 263. Admittedly the "locality" rule has been relaxed, and the knowledge possessed by a physician which renders him competent to testify as an expert can be from sources and experience other than in the locality in which the cause of action arose. Quinley v. Cocke, supra; Hundley v. Martinez (1967) 151 W.Va. 977, 158 S.E.2d 159. Once sufficient knowledge is shown to render the testimony competent the extent of knowledge affects only the weight of the testimony. Quinley v. Cocke, supra, citing: 32 C.J.S. Evidence sec. 545, p. 287.

440

██ The qualification of a witness as an expert is a matter largely within the determination of the trial court. Appellate courts will not reverse the ruling of a trial judge on the issue unless it is shown the trial judge was clearly in error. Quinley v. Cocke, supra; McElroy v. State (1921) 146 Tenn. 442, 242, S.W.2d 883. After a careful review of the rather lengthy and full testimony produced to qualify Dr. Chodoff as an expert medical witness, we feel the Trial Judge did not abuse his discretion in refusing to allow this witness to testify as to the standards of care and skill required of orthopedic surgeons and general practitioners in Memphis, Tennessee. Assignment of Error IV is overruled.

██ Assignment of Error V complains of the refusal of the Trial Judge to permit Dr. Chodoff to testify as an expert on the subject of vascular spasm. In fact the record reveals the Trial Judge refused to let the plaintiff even present Dr. Chodoff to be qualified as an expert on vascular problems. The defendants claim the amputation of plaintiff's forearm was necessary due to vascular spasm, which is a sudden spasm of the arteries and veins whereby the arteries and veins become closed, thereby cutting off the blood supply. If Dr. Chodoff could qualify as an expert on the subject, his testimony would be admissible on this disputed issue because we can conceive of no material difference between a vascular spasm in Pennsylvania and one in Tennessee. Assignment of Error V is sustained.

██ Assignment of Error VI complains of the refusal to permit Dr. Edward J. Haboush to testify as to the standards of care required of general practitioners in Memphis, Tennessee. Dr. Haboush is licensed to practice

medicine in the States of New York and Virginia. The record reveals Dr. Haboush is a qualified orthopedic surgeon, and there is no question as to his professional qualifications. Dr. Haboush had never been in Memphis, Tennessee prior to his appearance at the trial. The Trial Judge permitted Dr. Haboush to testify as to the standards of care and skill of orthopedic surgeons in Memphis, Tennessee, but disallowed similar testimony relating to general practitioners. The plaintiff never attempted to qualify Dr. Haboush as an expert witness on the standards of care and practice of a general practitioner. Under the circumstances we feel the Trial Judge did not abuse his discretion in limiting the scope of the testimony of this expert witness to the field of orthopedic surgery in which he did qualify as an expert. Assignment of Error VI is overruled.

By Assignment of Error VII the plaintiff insists the Trial Court erred in sustaining the motion of the defendant Dr. John R. Wills for a directed verdict at the close of the plaintiff's proof. The plaintiff was taken to Dr. Wills at about 4:00 P.M. on June 14, 1962. Portions of the pre-trial discovery deposition of Dr. Wills was read as plaintiff's proof in chief. Dr. Wills stated the mother of plaintiff told him she had been sent to him by Dr. Paul Williams for a urinalysis on the plaintiff child. Dr. Wills testified he performed a urinalysis, examined the plaintiff's eyes, ears, nose and throat, and found the plaintiff at that time had a temperature of 101.6 degrees Farenheit. This doctor stated he found an occasional hyaline cast in the plaintiff's urine, and admitted this would not have caused the high temperature which the plaintiff exhibited. Dr. Wills testified he knew the plaintiff had a compound fracture of the left

forearm, but he did not examine the left forearm and did not examine the fingers protruding from the cast. Dr. Wills stated he did not know what caused the high temperature and prescribed medicine for the plaintiff. Dr. Wills admitted that where another physician has requested the performance of tests, it is customary in the locality the physician requesting the tests be advised of the outcome of the tests if there is anything significant found. Dr. Wills did not report to Dr. Williams or anyone his findings on the urinalysis and his finding of the high temperature.

The pre-trial discovery deposition of Dr. B. G. Mitchell, portions read as proof in chief, establish this doctor would have insisted on the plaintiff coming to his office had he known she had a temperature of 101.6 degrees Farenheit at the time Dr. Wills examined her. Similar concern for this condition was expressed by Dr. Williams in his pre-trial discovery deposition, portions read to the jury as proof in chief.

Plaintiff's mother and a Mrs. Jean Shaw, who drove them to the office of Dr. Wills, testified the fingers of Cindy's left hand protruding from the cast had at that time a bluish or a bluish grey color.

The plaintiff had presented material evidence that infections can result from compound fractures in children; such infection can cause swelling; fever is a symptom of infection in a compound fracture; swelling in a cast such as plaintiff had on can cause a total circulatory cutoff which will result in gangrene if not relieved.

██ "In actions for malpractice, as in other civil cases, it is the province of the jury to determine disputed questions of fact. Thus, if the evidence with respect

thereto is conflicting, or is such that different inferences may properly be drawn therefrom, it is for the jury to determine * * * whether proper skill or care was exercised in the treatment of the patient." 70 C.J.S. Evidence sec. 63, pp. 1010, 1011, citing: Casenburg v. Lewis, 163 Tenn. 163, 40 S.W.2d 1038; Johnson v. Ely, 30 Tenn. App. 294, 205 S.W.2d 759; Glover v. Burke, 23 Tenn.App. 350, 133 S.W.2d 611.

We conclude there is ample material evidence from which the jury could find Dr. Wills did not exercise proper skill or care in the treatment of the plaintiff. Any expert testimony needed to present a question of fact as to the degree of care and skill exhibited by Dr. Wills was furnished by his own admissions as herein noted. The Trial Court erred in directing a verdict in favor of the defendant Dr. John R. Wills and Assignment of Error VII is accordingly sustained.

Assignment of Error VIII pertains to certain court room proceedings in the presence of the jury. The plaintiff was reading portions of the pre-trial discovery deposition of the defendant Dr. Paul H. Williams when the Trial Judge instructed him to skip down to a certain question and begin reading there. No answer had been given to the particular question in the deposition. Plaintiff's counsel read the question as instructed by the Trial Judge, whereupon defendant's counsel objected, which objection was sustained by the Trial Judge. Plaintiff's counsel requested the Trial Judge to tell the jury the question was read at the instruction of the Trial Judge, which request was refused. This proceeding certainly appears to have been unnecessary, however, we cannot see any prejudice resulting therefrom and Assignment of Error VIII is overruled.

Assignments of Error IX, X, and XI relate to the refusal of the Trial Judge to permit the plaintiff to cross-examine the defendant Dr. B. G. Mitchell and defendant's expert witness Dr. J. C. Lougheed by using certain authoritative medical treatises.

It is established in Tennessee an expert witness may be cross-examined by the use of standard authorities on the subject. The Court in Sale v. Eichberg (1900) 105 Tenn. 333, 59 S.W. 1020, cited Byers v. Nashville, C. & St. L. Railroad Co., 94 Tenn. 345, 29 S.W. 128, which states: "When a witness is testifying as an expert, it is competent to test his knowledge and accuracy upon cross-examination by reading to him, or having him read, extracts from standard authorities upon the subject-matter involved, and then asking him whether he agreed or disagreed with the authorities, and comparing his opinion with those of the writer."

The Trial Judge refused to permit the experts to be cross-examined by the use of authoritative medical books and treatises because in each instance the witness stated he had not read the particular book or treatise. We do not find a reported Tennessee case on the precise question. There is quite a division of authority in other jurisdictions. See Wigmore on Evidence, 3rd Ed., Vol VI, sec. 1700, p. 18.

The Appellate Division of the Superior Court of New Jersey in Ruth v. Fenchel (1955) 37 N.J.Super.295, 117 A.2d 284, the opinion written by Mr. Justice Goldmann, extensively reviewed the entire field of whether works of recognized standard authority may be used in the cross-examination of an expert witness. The Court concluded: "We deem it the sounder and more sensible rule that

recognized medical works may be used on cross-examination of a medical expert, whether he relied on them directly or indirectly, or *not at all,* and this for the purpose of testing his knowledge and the accuracy of his opinion.'' (Emphasis added).

■ The defendant doctor and his witness had both testified on the issues of negligence and causation. The object of using the authoritative books and treatises was to test the experts' testimony by having them refer to and comment upon the contents thereof. The books and treatises were not offered as proof of the subject matter therein expressed, but rather to test the knowledge and accuracy of the experts. Under these circumstances we hold the Trial Judge erred in refusing the plaintiff the right to use authoritative medical text books and treatises in the cross-examination on the ground the experts had not read the works referred to. Abrams v. Gordon (1960) 107 U.S.App.D.C. 254, 276 F.2d 500. To hold otherwise would be to render more valid, and beyond the realm of contradiction, the opinion of the less read and probably poorer expert over the opinion of the better read and probably more competent expert. Assignments of Error IX, X and XI are sustained.

■ However, we do not agree with the *Abrams* case above cited to the effect the plaintiff does not have to prove the authoritative nature of the medical work offered in situations where the expert being cross-examined states he has not read or relied on that particular work. The usual manner of qualifying the work as authoritative is to ask the expert being cross-examined if that particular book or treatise is recognized as authoritative on the subject. Normally, the expert witness will

have knowledge of the authoritative nature of the work and can then express his opinion on that issue.

We hold where the expert being cross-examined does not or will not acknowledge the medical authority presented, the authoritative character of the book or treatise offered for the purpose of cross-examination must be proven by independent evidence. Stallings v. State (1953) 232 Ind. 646, 114 N.E.2d 771; Smarr v. State (1953) 260 Ala. 30, 68 So.2d 6. Demanding proof as to the authoritative nature of the medical work offered has the wholesome effect of not permitting this issue to be determined by mere statement of counsel. Laird v. Boston & M. R. Co. (1922) 80 N.H. 377, 117 A. 591. The extent and type of proof required to establish the authoritative nature of the medical book or treatise is a matter largely within the discretion of the trial judge.

By Assignment of Error XII the plaintiff complains of a statement made by the Trial Judge in the presence of the jury which the plaintiff submits was a comment upon the weight of the evidence and prejudicial to the plaintiff. Without quoting the testimony at length, the issue being examined was whether or not Dr. B. G. Mitchell did or did not find a compound fracture of the left forearm of Cindy McCay. The medical report signed by Dr. Mitchell at the time of the original examination showed the injury to be a compound fracture of the left forearm.

Dr. Mitchell on direct testimony before the jury described the wound in plaintiff's arm, its size and location in relation to the fractured bones, and insofar as the existence of a compound fracture was concerned stated: "I felt that it was absolutely impossible." The doctor

was referring to his findings at the hospital when he made his initial examination of the plaintiff.

On cross-examination the plaintiff was questioning Dr. Mitchell as to statements made in his pre-trial discovery deposition on the existence of a compound fracture and read therefrom the following question and answer:

"Q. Would you say based on the X-ray evidence and your findings made on June 9, 1962, that in your opinion there is a possibility that in the fracturing process of both bones of the forearm of Cindy McKay that these bones in the fracturing process could have caused the puncture wound that you found approximately an inch from the flexor carpal crease of the wrist?

A. I say it could have."

This defendant was then asked if he made that answer to the question read, whereupon the Trial Judge interrupted and stated:

*"THE COURT*: He's saying that today, Mr. Cox, that's exactly the way he had testified here today. Now let's use that where his testimony is inconsistent in that deposition and what he had testified to today. That's the only purpose for reading that deposition again, we've been over that once."

The effect of the Trial Court's interruption and statement was to rule the statement made by the defendant on direct examination and the statement made on pre-trial discovery was the same as related to his finding of a compound fracture. A reading of the testimony quoted clearly show the statements were not the same in this respect. Material evidence was before the jury as to

the degree of care and treatment normally associated with a compound fracture as distinguished from a simple fracture; the possibility of infection resulting from that type fracture; the procedure for setting, etc. It was for the jury to weigh this testimony of Dr. Mitchell without having the difference therein relegated to an inconsequential similarity by the Trial Judge. The constitutional guaranty of a trial by jury requires the judge to be extremely careful to not express an opinion on any fact to be passed on by the jury. Graham v. McReynolds (1891) 90 Tenn. 673, 18 S.W. 272; City of Nashville v. Patton (1910) 2 Tenn.C.C.A. (Hig.) 515; Leighton v. Henderson (1967) 220 Tenn. 91, 414 S.W.2d 419.

Under the facts of the signed medical report, the pre-trial discovery statement and the direct testimony on a disputed issue material to the lawsuit, we feel this statement by the Trial Judge cannot be dismissed as harmless error. We hold this statement amounted to a weighing of the evidence by the court in the presence of the jury, and cannot be characterized as other than prejudicial to the plaintiff. Assignment of Error XII is sustained.

Assignment of Error XIII complains of the ruling of the Trial Judge on the form of a hypothetical question plaintiff propounded to her expert witness Dr. Haboush which went to the care and skill applied by the defendant Dr. Paul H. Williams when he talked by telephone with the plaintiff's mother on the night of Wednesday, June 13, 1962, and recommended the care to be given would be for the parents to elevate the forearm of the child. The question as presented assumed facts which occurred after the event of the telephone call. The Trial Judge ordered that portion of the question

stricken and limited the question to the assumption of those facts which Dr. Williams was charged with knowing at the time of the telephone call and his recommended treatment. There is no error here, and should there be error, it was effectively cured by the testimony of the expert Dr. Haboush to the effect the treatment recommended by Dr. Williams under the facts as presented was wholly insufficient and not according to the standard of care and skill required of orthopedic surgeons under the circumstances. In other words the testimony was as favorable to the plaintiff as she could have expected. Assignment of Error XIII is overruled.

Assignment of Error XIV complains of the ruling of the Trial Judge in refusing a hypothetical question to plaintiff's medical expert Dr. Haboush as to whether the defendant Dr. B. G. Mitchell exercised that degree of care and skill in the treatment of Cindy McCay as required of orthopedic surgeons in Memphis, Tennessee so far as the prevention, detection and treatment of infection; detection and treatment of loss of blood supply; prevention, detection and treatment of gangrene; and the prevention of amputation of the left forearm of Cindy McCay were concerned. The facts related in that hypothetical question, to be assumed by the expert, were justified by the record. However, we feel the plaintiff went too far in asking for the conclusions as above related. These are the very issues which were hotly contested throughout the trial and were the issues which had to be found or rejected by the jury. The Trial Judge permitted other hypothetical questions to plaintiff's expert and the answers given clearly place before the jury the opinion of the expert that the defendant, Dr. B. G. Mitchell, did not use the degree of care and skill common

to orthopedic surgeons in the care of Cindy McCay. We feel the Trial Judge did not err in rejecting this hypothetical question, and should same be error it is harmless in that the standard of care and skill of Dr. Mitchell was clearly and unconditionally challenged by this same expert. Assignment of Error XIV is overruled.

Assignment of Error XV claims error wherein a hypothetical question was disallowed which, after a recitation of facts, asked the expert Dr. Haboush ''* * do you have an opinion as to what if any care, treatment and attention could have been given the plaintiff, Cindy McCay, from 5:00 P.M. June 9, 1962, through June 15, 1962?'' We hold this question properly excluded because it does not relate to what was properly or improperly done, but rather it opens the door to conjecture as to what might have been done. Assignment of Error XV is overruled.

By Assignment of Error XVI the plaintiff complains of the refusal by the Trial Judge to charge her Special Request Number 2 pertaining to hypothetical questions which request is as follows:

''In considering the weight to be given the testimony of expert witnesses, you are instructed that certain witnesses have expressed opinions in answer to hypothetical questions, which questions assumed a certain set of facts. An expert witness, in answering a hypothetical question, assumes as true every asserted material fact stated in the question. If you find that the evidence fails to establish the truth of the asserted material facts in the hypothetical question, then you should not consider the answer of the expert to that hypothetical question, and you should disregard such answer.''

■■■ A review of the general charge as given establishes the Trial Judge made no charge as to the law governing hypothetical questions. A hypothetical question based on nonexistant facts should have no value. Sepaugh v. Methodist Hospital (1947) 30 Tenn.App. 25, 202 S.W.2d 985. The instruction as requested is technically correct and should, under the circumstances, have been charged to the jury. Assignment of Error XVI is sustained.

Assignments of Error XVII, XVIII, XIX and XX complain of the refusal of certain special requests as made by the plaintiff. A review of the general charge satisfies the Court the substance of the requested charges were substantially covered in the general charge, and those Assignments of Error are overruled.

Assignments of Error XXI, XXII and XXIII complain of certain paragraphs of the general charge as given by the Trial Judge. These statements by the Court when considered along with all statements and instructions to the jury do not constitute error in that the entire charge fairly stated the law as applicable to the issues. These Assignments of Error are overruled.

■■■ Assignment of Error XXIV that the jury verdict was contrary to the weight and preponderance of the evidence does not present an issue to be determined by this Court on appeal in error, and is overruled.

■■■ Assignment of Error XXV that the entire tenor of the trial was prejudicial and materially influenced the jury's verdict is a general assignment of error and cannot be considered by the Court. Rule 12 Court of Appeals. This Assignment of Error is overruled.

■ Assignment of Error XXVI is the Trial Judge erred in overruling the plaintiff's motion for a new trial. If there were only one ground of motion for new trial we could probably accept this assignment as sufficient. However, here there were fifty-six grounds for motion for new trial, which resulted in twenty-six assignments of error to this Court. Under these circumstances this assignment is too broad and does not comply with the spirit of Rule 12 of this Court, and is overruled.

It results the judgment of the Trial Court is reversed and this cause is remanded to the Circuit Court of Shelby County, Tennessee for a new trial. Cost of this appeal is adjudged against the three defendants; costs in the Trial Court to await the outcome of the new trial.

Carney, P.J., and Nearn, J., concur.