Cory L. AYERS, a minor by his parents and natural guardians Lynn L. AYERS and Virginia W. Ayers, and Lynn L. Ayers and Virginia W. Ayers, Individually, Plaintiffs-Appellants,

v.

RUTHERFORD HOSPITAL, INC., Dr. Terry J. Witt, and Dr. Charles Smith, Defendants-Appellees.

Court of Appeals of Tennessee, Middle Section at Nashville.

Oct. 23, 1984.

Application for Permission to Appeal Denied by Supreme Court April 22, 1985.

Charles Fraley, Knoxville, for plaintiffs-appellants.

William C. Moody, Moody & Moody, Nashville, for Rutherford Hosp., Inc.

John B. Carlson, Watkins, McGugin, McNeilly & Rowan, Nashville, for Dr. Terry J. Witt.

Mary Martin Schaffner, Douglas Fisher, Howell, Fisher, Branham & North, Nashville, for Dr. Charles Smith.

## OPINION

LEWIS, Judge.

This is an appeal by plaintiffs from the Trial Judge's sustaining of motions for summary judgment for each of the defendants.

The pertinent facts are as follows:

Plaintiff Virginia W. Ayers gave birth to a son, Cory L. Ayers, in the Rutherford Hospital on August 14, 1975. Mrs. Ayers stated in her deposition that she had had no complications in her pregnancy except that around the sixth month of her pregnancy, Dr. Fisher had x-rays made because of his feeling that the child was too large for her to deliver. Dr. Fisher referred Mrs. Ayers to defendant, Dr. Terry J. Witt, who first saw her on August 6, 1975. After examining Mrs. Ayers, Dr. Witt was of the opinion that she should be allowed to go into labor and deliver the baby normally.

During the August 6, 1975 examination, Dr. Witt informed Mrs. Ayers that he would be out of town the following week but that an obstetrician would be on call at all times at the Rutherford Hospital. He also informed Mrs. Ayers that if she had not given birth when he returned to town, he would probably induce labor.

On August 13, 1975, Mrs. Ayers went into labor. She called Rutherford Hospital and was informed that Dr. Witt was not in town. At approximately 8:00 P.M., plaintiffs, Mr. and Mrs. Ayers, drove from their home in McMinnville to the Rutherford Hospital where Mrs. Ayers was admitted. Dr. Witt was out of town and knew nothing concerning her admittance to the hospital until after Cory's birth.

Defendant Dr. Charles Smith, who delivered Cory, saw Mrs. Ayers for the first time at Rutherford Hospital at 9:00 A.M., on August 14, 1975. Prior to that time, Dr. Smith had no knowledge of her condition. Dr. Witt and Dr. Smith had not discussed Mrs. Ayers or her pregnancy and Dr. Smith was not informed by anyone, including Rutherford Hospital personnel, that Mrs. Ayers was anything but a typical obstetric patient. Dr. Smith, after seeing Mrs. Ayers at 9:00 A.M., repeatedly assured himself of the normalcy of her progression of labor. Mrs. Ayers' progress in labor to full dilation was normal. Dr. Smith was continuously available to deliver the baby and, according to Dr. Smith, "[t]here was never any indication that a Caesarean section should be performed in order to avoid injury to the baby."

Immediately prior to delivery, Dr. Smith rotated the baby with forceps to position it correctly for delivery. There were no complications, except for an injury to his left brachial plexis which resulted in a temporary weakness in his left arm. However, Cory was delivered without difficulty and was in good condition at birth. Cory was completely normal until he was eighteen or twenty months old when he experienced high fever and seizures.

Dr. Gerald M. Fenichel, Neurologist in Chief at Vanderbilt University Hospital and the Children's Regional Medical Center, first saw Cory in May of 1977 "when he was admitted to Vanderbilt University Medical Center due to a 'seizure disorder.'" Dr. Fenichel admitted Cory to the Medical Center on four other occasions and continues to treat him on an out-patient basis. Dr. Fenichel examined the medical records and stated:

In my opinion, based upon reasonable degree of medical certainty, Cory Ayers did not sustain brain injury when he was born; his seizure disorder is wholly unrelated to events at birth. While the specific etiology of his seizure disorder cannot be identified with certainty, the course of his disorder is most compatable with an infectious process which began when he was approximately twenty months old.

Cory was also seen and treated for several years by Dr. Lawrence Ch'ien, Chief of Neurology and Psychology at St. Jude's Children's Research Hospital in Memphis.

Dr. Ch'ien also concluded that Cory's "seizure disorder is not related to events at birth."

Dr. Stephen C. Prinz, Director of Neonatology of the Children's Intensive Care Nursery at East Tennessee Children's Hospital in Knoxville, reviewed hospital and medical records and reached the same conclusion.

Dr. Witt, in support of his motion for summary judgment filed on December 2, 1981, filed his affidavit in which he set forth his lack of involvement in the delivery of Cory and further stated: "I am now and was at the time of my consultation with Mrs. Ayers licensed to practice medicine in Tennessee, and familiar with the accepted and prevailing medical standards in this community among physicians and obstetricians. My examination of Mrs. Ayers fully complied with these standards."

Dr. Smith filed his motion for summary judgment on January 18, 1982, and, in support of that motion, filed his affidavit which set forth his involvement with Mrs. Ayers and Cory. Also in support of his motion, affidavits of Dr. Fenichel, Dr. Ch'ien, and Dr. Stephen C. Prinz were filed. He also included the affidavits of Dr. Jerry Campbell, who is in the private practice of pediatrics in Murfreesboro, and Dr. John Alexander, who is in the private practice of obstetrics and gynecology in Murfreesboro and who, after examining the medical records, stated that he was "familiar with the standard of care required of obstetricians practicing in Murfreesboro within the time in question. In my opinion, the medical care given by Dr. Charles Smith to Virginia Ayers during her labor and delivery and the care given to her infant son, Cory Ayers, conformed in every respect to the standard of care required of obstetricians practicing in Murfreesboro, Tennessee in August of 1975."

On January 21, 1982, defendant Rutherford Hospital, Inc. filed its motion for summary judgment and adopted "the brief, affidavits, and stipulated material submitted by the co-defendants."

Dr. Witt's motion had been set for hearing prior to the filing of Dr. Charles Smith and Rutherford Hospital's motions for summary judgment. After Dr. Smith and Rutherford Hospital filed their motions, plaintiffs moved to continue the hearing. Plaintiffs' motion was granted on the condition that they produce an expert witness in the Middle Tennessee area to give a deposition by March 8, 1982. No such witness was produced; however, on March 15th, in opposition to defendants' motions for summary judgment, plaintiffs filed the affidavit of Dr. David C. Abramson, which states the following:

DAVID C. ABRAMSON, M.D., of full age, being duly sworn according to law upon his oath deposes and says:

1. I am a physician boarded in pediatrics with a sub-specialty in NEWBORN AND PERINATAL MEDICINE, and being a chartered member of the American College of Emergency Physicians, licensed in Washington, D.C., Maryland and Virginia, and residing in Virginia.

2. At the request of J.D. Lee, Esquire, of Knoxville, Tennessee, I have reviewed and studied the following sources of information:

a. Correspondence from Esquire: March 4, 1980;

b. Admission Records of Virginia Ayers, (maternal) Rutherford Hospital, Inc., Murfreesboro, Tennessee: Hospitalization I: August 13–18, 1975;

c. Admission Records of Cory Ayers, (infant) Rutherford Hospital, Inc., Murfreesboro, Tennessee: Hospitalization I: August 14–18, 1975; Hospitalization II: May 26–27, 1977;

d. Admission Records of Cory Ayers, Vanderbilt University Hospital, Nashville, Tennessee: Hospitalization III: May 30–31, 1977; Hospitalization IV: June 5–8, 1977; Hospitalization V: September 28—October 1, 1977; Hospitalization VI: November 9–11, 1977; Hospitalization VII: November 13–15, 1977;

e. Admission Records of Cory Ayers, Rutherford Hospital, Inc., Murfreesboro, Tennessee: Hospitalization VIII: December 28—January 1, 1978; Hospitalization IX: May 24–29, 1979

f. Doctor's Reports;

g. Emergency Room Records;

h. Baptist Memphis Hospital Records, Memphis, Tennessee.

i. St. Jude's Children's Research Hospital Records, Memphis, Tennessee;

(j) Pleadings;

k. EEG Reports.

3. Virginia Ayers, having a high risk pregnancy in August, 1975, failed to progress normally in labor, should have been delivered by Cesarean section, however, was delivered by traumatic forceps which resulted in life long injury to her son, Cory Ayers.

The motions for summary judgment were reset for hearing for June 21, 1982. On June 18, 1982, plaintiffs filed a second affidavit, which states the following:

DAVID C. ABRAMSON, M.D., of full age, being duly sworn according to law upon his oath deposes and says:

1. I am a physician boarded in pediatrics with a sub-specialty in NEWBORN AND PERINATAL MEDICINE, and being a chartered member of the American College of Emergency Physicians, licensed in Washington, D.C., Maryland and Virginia, and residing in Virginia.

2. I was licensed in the State of Virginia, and practiced in Virginia in the year 1974 and all years thereafter.

3. I am familiar with the standard of care required of physicians in delivery and perinatal care of newborns as it would pertain to a community such as Murfreesboro, Tennessee.

4. I have carefully reviewed the Rutherford Hospital records for both Cory and Virginia Ayers, dated 8–13–18–75, and the same hospital admissions of 5–26–77 and 12–19–77, the Vanderbilt University Hospital records dated 5–30–77, 6–5–77 and 11–9–77. I have also reviewed the report of the computed axial tomography, the St. Jude out-patient records, and the EEG report from Le Bonbeur Children's Hospital. Based on this review, I have the following opinions in this case.

Mrs. Ayers pregnancy had progressed normally but became "high risk" when she progressed more than two weeks beyond her due date. She presented to the hospital and doctor with a small pelvis and a fetus that was engaged at term. Her labor failed to progress normally, and Cory was delivered after a mid-forceps rotation and had clear evidence of birth trauma including bruising and paralysis of the left upper extremity.

As a direct result of the breaches in standard perinatal care, Cory suffered profound injury to his central nervous system which has left him with severe learning disabilities and a resistant seizure disorder which will demand lifelong care.

5. I am of the opinion that to allow Virginia Ayers to deliver vaginally was a departure from the standard of care required of the physicians caring for the pregnancy and that such is the proximate cause of Cory Ayers's condition.

The motions for summary judgment were heard on June 22, 1982, and sustained as to Rutherford Hospital, Inc. and Dr. Terry J. Witt. The suit was dismissed as to them. The Trial Court, in its order, further stated: "Unless plaintiffs produce for the purpose of giving deposition testimony in the Middle Tennessee-area an expert witness to testify on their behalf by July 5, 1982, this suit shall stand dismissed as to Dr. Charles Smith."

Plaintiffs did not comply with this order but did produce Dr. Abramson for deposition on January 13, 1983. He testified that from 1972 through 1978 he was the "Chief of the Division of Newborn and Perinatal Medicine in the Department of Pediatrics and Obstetrics and Gynecology at Georgetown University" and that he resided in Washington, D.C. from approximately 1962 until "approximately 1979 or '80." He resided in Alexandria, Virginia, until 1982 when he moved back to Washington, D.C.

During the year preceding the birth of Cory Ayers, Dr. Abramson was a "geo-

graphic full-time" faculty member at Georgetown University Medical Center in Washington, D.C. and was also engaged in private practice with a group "called either Georgetown Perinatal Association or Georgetown Neonatal Associates." His office for seeing patients on a private basis was in the hospital at Georgetown, but he also saw patients during the year preceding Cory's birth at his home, also located in Washington, D.C.

Dr. Abramson stated in his second affidavit that he was "familiar with the standard of care required of physicians in delivery and perinatal care of newborns as it would pertain to a community such as Murfreesboro, Tennessee." However, in his deposition, he testified that he had never been to Murfreesboro, that he did not know where in Tennessee Murfreesboro was located, that he knew nothing about the size of the community, that he did not know how large the hospital was, that he knew no one from Murfreesboro, and that he knew no one who had ever practiced medicine in the city. He was asked if he was "familiar with the skills of the practitioners in Murfreesboro," and he answered: "Insofar as they are trained and examined and have developed the same sets of skills, read the same literature, update their skills, go to the same conferences for continuous education that I do, come to my conferences when I give them in Tennessee." He testified that the standard of care "does not vary throughout the country," that it is a national standard, and "doesn't change with the locality."

Dr. Abramson further testified that the national standard requires

> that when a woman goes into labor more than fourteen days post-estimated date of confinement, that she be continuously monitored by a physician in attendance or someone capable of delivering that fetus at the earliest sign of fetal compromise. And by 1975 that was well understood and appreciated.

He further testified that

> the physician must come and evaluate his or her patient, or be certain that someone

is there capable of delivering that infant at the earliest sign of fetal compromise. The fetus has a tremendously high risk.

He further testified that the standard of care in Murfreesboro, Tennessee in 1975 was "the same as the standard of care for human beings under medical care and supervision in Tennessee, Virginia, Maryland, the District, and throughout the area of adjacent states," that the standard "required physician evaluation of the post-dated pregnancy at the onset of labor and continuous assurance of fetal well-being and normal progress of labor throughout the duration of that labor" and that "delivery be able to be effectuated by a competent physician at the first sign of fetal compromise." Further, "the attendant physician must do an initial evaluation."

It was Dr. Abramson's opinion that Dr. Smith violated the national standard of care because "he didn't appear at the onset of labor; so he ignored the medical emergency that way. He didn't appear to evaluate."

Dr. Frank Boehm, Director of Vanderbilt's Maternal/Fetal Medicine Division and an Obstetrician who had practiced at Vanderbilt University Hospital in Nashville since 1972, stated in his affidavit that "[t]he standard of accepted practice applicable to physicians practicing obstetrics varies significantly between localities." Dr. Boehm, also a member of the Tennessee Perinatal Advisory Committee, further stated:

> [T]here is a clear difference between the standard of care applicable to physicians practicing in smaller hospitals such as the hospital located in Murfreesboro, Tennessee, and the standard applicable to physicians practicing in large teaching hospitals such as Vanderbilt.... To state that the standard of care applicable to obstetricians does not vary throughout the United States is to ignore these variables and to misrepresent the true situation.

This record is devoid of any evidence that Dr. Smith knew Mrs. Ayers was more than

fourteen days post-estimated date of confinement, or that Dr. Smith had any of the knowledge of the operative facts upon which Dr. Abramson based his opinion that Dr. Smith violated the national standards.

Dr. Smith's affidavit states that he was not informed when Mrs. Ayers was admitted to the hospital that she was more than fourteen days past her estimated date of confinement. He was not aware of this fact until he saw her in the hospital at 9:00 A.M. on August 14, 1975. Dr. Smith saw Mrs. Ayers for the first time when she was in the hospital, in labor, at 9:00 o'clock on August 14th.

Plaintiffs present two issues for our determination. They are:

1. Whether or not the Honorable Trial Judge erred in granting Motions for Summary Judgment filed on behalf of all named Defendants, specifically, Rutherford Hospital, Inc., Dr. Terry J. Witt, and Dr. Charles Smith.

2. Whether or not the Honorable Trial Judge erred in finding that Plaintiff's expert witness, Dr. David Abramson, was not competent to testify in this case for the reasons set forth in the Trial Court's final Order filed on January 17, 1984.

Summary judgment

was designated to provide a quick, inexpensive means of concluding cases, on issues as to which there is no dispute regarding material facts, but was in no wise designed for the trial of factual issues. It can be granted only when the pleadings, stipulations, and affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.

*Brookins v. The Round Table, Inc.*, 624 S.W.2d 547, 550 (Tenn.1981).

 In Tennessee, expert testimony is required to establish negligence and proximate cause in malpractice actions unless the alleged malpractice is within the common knowledge of laymen. *Phelps v. Vanderbilt University*, 520 S.W.2d 353 (Tenn. App.1974). In medical malpractice cases,

only the most obvious forms of negligence may be established without expert testimony. For example, any lay person would know that leaving a sponge in the plaintiff's body is negligence. *Rural Educational Association v. Bush*, 42 Tenn.App. 34, 298 S.W.2d 761 (1956).

In *Bowman v. Hennard*, 547 S.W.2d 527 (Tenn.1977), our Supreme Court held that while motions for summary judgment are generally inappropriate in professional malpractice cases, if the only issue is one which requires expert testimony and there is no expert response to an affidavit by an expert, then summary judgment is proper. *Id.* at 530.

Here, there is no contention that the alleged negligence of the defendant is so obvious that it may be established without expert testimony.

We discuss plaintiffs' issues in reverse order, for if the Trial Judge correctly refused to consider Dr. Abramson's testimony, there is no evidence in the record upon which plaintiffs' allegations of negligence may be based.

The affidavits of Dr. Smith and Dr. John Alexander refute plaintiffs' allegations of negligence. Dr. Alexander, a physician engaged in the practice of obstetrics and gynecology in Murfreesboro before and at the time of Cory's birth, states that he is familiar with the standard of care required of obstetricians practicing in Murfreesboro during the time in question and that Dr. Smith "conformed in every respect to the standard of care required of obstetricians practicing in Murfreesboro, Tennessee, in August, 1975."

The only medical evidence offered by plaintiffs to counter defendants' expert evidence is Dr. Abramson's affidavits and deposition.

Tennessee Code Ann. § 29–26–115(b) provides:

No person in a health care profession requiring licensure under the laws of this state shall be competent to testify in any court of law to establish the facts re-

quired to be established by subsection (a) unless he was licensed to practice in the state or a contiguous bordering state a profession or specialty which would make his expert testimony relevant to the issues in the case and had practiced this profession or specialty in one of these states during the year preceding the date that the alleged injury or wrongful act occurred. This rule shall apply to expert witnesses testifying for the defendant as rebuttal witnesses. The court may waive this subsection when it determines that the appropriate witnesses otherwise would not be available.

The Trial Court entered the following order on January 17, 1984:

This action was heard on January 9, 1984, upon plaintiffs' motion to amend the court's order entered June 24, 1982 which dismissed this action as to Dr. Charles Smith unless, by July 5, 1982, plaintiffs produced for the purpose of giving deposition testimony in the Middle Tennessee area an expert witness to testify on their behalf in opposition to the motion for summary judgment filed on behalf of Dr. Smith. Upon reviewing the entire record in this cause and after hearing argument of counsel for the plaintiffs and of counsel for Dr. Smith, the court is of the opinion that Dr. David Abramson, the expert witness ultimately produced by plaintiffs for a deposition on January 13, 1983, is not competent to testify in this action as to the local standard of practice or as to Dr. Smith's failure to conform to such standard in that Dr. Abramson did not practice medicine in Tennessee or in a contiguous bordering state during the year preceding the date that the alleged injury or wrongful act occurred as required by T.C.A. § 29–26–115(b); because plaintiffs have made no showing that appropriate witnesses otherwise would not be available, this requirement will not be waived. The court is further of the opinion, based upon Dr. Abramson's deposition testimony, that Dr. Abramson is not familiar with the community in which the defendant practiced or with the treatment, care,

and skill of practitioners in Murfreesboro and, therefore, that Dr. Abramson is not qualified to testify as a medical expert regarding the local standard of practice in Murfreesboro or a similar community or as to Dr. Smith's alleged failure to conform to such standard in his care of Mrs. Ayers and her baby as required by T.C.A. § 29–26–115(a). The court is further of the opinion that Dr. Abramson has not testified as to negligence for which Dr. Smith can be held responsible in this action. The court, therefore, is of the opinion that the order entered June 24, 1982, properly disposes of plaintiffs' claim against Dr. Smith, that plaintiffs' motion to amend that order should be overruled, and that this action should stand dismissed as to Dr. Smith.

■ We are of the opinion after a review of this record that the Trial Court correctly found that Dr. Abramson was not competent to testify "as to the local standard of practice or as to Dr. Smith's failure to conform to such standard in that Dr. Abramson did not practice medicine in Tennessee or a contiguous bordering state during the year preceding the date of the alleged injury...." We are further of the opinion that the record fully supports his finding that the plaintiffs made no showing that Tenn.Code Ann. § 29–26–115(b) should be waived since there is nothing in the record to show that an "appropriate witness otherwise would not be available."

Dr. Abramson stated in his second affidavit that he "was licensed in the State of Virginia and practiced in Virginia in the year 1974 and all years thereafter." His deposition testimony demonstrates, however, that he did not practice in Virginia in 1974. He testified that during the year preceding the date of Cory's birth, he was a "geographic full-time" faculty member at Georgetown University Medical Center which is located in Washington, D.C. He further testified that while he was engaged as a full-time faculty member, he also engaged in private practice through a group called Georgetown Perinatal Association or Georgetown Neonatal Associates, Inc., see-

ing patients in the hospital and that his fees for private practice were billed through this group. He did see patients during this time at his office located in his home; however, this office was located in Washington, D.C.

Despite Dr. Abramson's assertion in his second affidavit that he practiced in Virginia in the year 1977, his deposition clearly states that his actual practice was in Washington, D.C. during the year preceding Cory's birth.

Dr. Abramson's affidavit and his deposition regarding the location of his practice are contradictory and thus cancel each other out and force us to disregard them as a matter of law. *Tibbals Flooring Co. v. Stanfill,* 219 Tenn. 498, 410 S.W.2d 892 (Tenn.1967). Therefore, there is no testimony in the record as to the location of Dr. Abramson's practice in the year preceding the date of the alleged injury.

We are also of the opinion that the Trial Court did not abuse its discretion in determining that Dr. Abramson was not qualified to testify as an expert regarding the local standard of care required of physicians practicing obstetrics in Murfreesboro.

Tenn.Code Ann. § 29–26–115(a)1 provides:

(a) In a malpractice action, the claimant shall have the burden of proving by evidence as provided by subsection (b):

1. The recognized standard of acceptable professional practice in the profession and the specialty thereof, if any, that the defendant practices in the community in which he practices or in a similar community at the time the alleged injury or wrongful action occurred;

2. That the defendant acted with less than or failed to act with ordinary and reasonable care in accordance with such standard; and

3. As a proximate result of defendant's negligent act or omission, the plaintiff suffered injuries which would not otherwise have occurred.

In *Scarborough v. Knoxville Orthopedic Clinic,* (Tenn.App. at Knoxville, July 19, 1977), commenting on Tenn.Code Ann. § 29–26–115(a)1, Judge Goddard, writing for the Court, stated:

While this statute did not become effective until July 1, 1975, it is not applicable to this case, it is nevertheless the legislature's expression of policy regarding the standard of care of Tennessee. Thus, while prior cases may appear to present a trend toward relaxation of the locality rule, it is clear that the legislature by the enactment of the foregoing statute intended to continue its application.

*Id.* Tenn.Code Ann. § 29–26–115(a)1 is applicable in this case.

Prior to the enactment of Tenn.Code Ann. § 29–26–115(a)1, this Court, in *McKay v. Mitchell,* 62 Tenn.App. 424, 463 S.W.2d 710 (1970), held that "[t]o qualify as expert witness in a malpractice action, it must appear he is familiar with the treatment and care and skill of practitioners in the locality" in which the cause of action arose. In *McKay,* the trial judge refused to allow plaintiff's expert, a physician from Pennsylvania, to testify as to the standard of care and skill required of orthopedic surgeons and general practitioners in Memphis. The expert's testimony as to standard of care in Memphis was based on his attendance at medical meetings, his study of medical papers, and his familiarity with the works of eminent physicians and surgeons in various fields of medicine. He had never practiced medicine in Memphis. The court acknowledged that "the knowledge possessed by a physician which renders him competent to testify as an expert can be from sources and experiences other than in the locality in which the cause of action arose." *Id.* at 718. This Court noted that "the qualification of a witness as an expert is a matter largely within the determination of the trial court. *Id.*

The trial judge has broad discretion in dealing with the qualifications and admissions of testimony of expert witnesses. *See, e.g., Shelby County v. Barden,* 527 S.W.2d 124 (Tenn.1975); *Cordell v. Ward School Bus Manufacturing, Inc.,* 597 S.W.2d 323 (Tenn.App.1980).

In this case the court had before it Dr. Abramson's testimony that he had never been to Murfreesboro, did not know where in Tennessee the city was located, had no knowledge of whether Murfreesboro was a large or small town, knew no individuals in Murfreesboro, knew no physicians, other than the defendants in this suit, who practiced medicine in Murfreesboro, and that he did not know where defendant physicians were trained or the size of the hospital in which Cory was born.

He also had before him the testimony of Dr. Frank Boehm who stated:

[T]here is a clear difference between the standard of care applicable to physicians practicing in smaller hospitals such as the hospital located in Murfreesboro, Tennessee, and the standard applicable to physicians practicing in large hospitals such as Vanderbilt.... To state that the standard of care applicable to obstetricians does not vary throughout the United States is to ignore the variables and to misrepresent the true situation.

Our review of this record fails to disclose that the Trial Judge abused his discretion in refusing to allow Dr. Abramson's testimony as an expert. This issue is without merit.

However, even if Dr. Abramson's testimony was considered, there is no disputed issue of material fact as to Rutherford Hospital, Inc. and Dr. Terry J. Witt. We find nothing either in the two affidavits submitted by Dr. Abramson or in his deposition which in any way touches upon negligence of Rutherford Hospital, Inc.

In fact, the motions for summary judgment on behalf of both Dr. Witt and Rutherford Hospital had been sustained prior to the taking of Dr. Abramson's deposition. Therefore, if the Trial Judge erred, it must be on the basis of Dr. Abramson's affidavits.

Dr. Witt's affidavit, filed in support of his motion for summary judgment, set forth the fact that he saw Mrs. Ayers only on August 6, 1975, and that he had no involvement at all in the delivery of Cory.

This is admitted by Mrs. Ayers. Dr. Witt's affidavit also states that he is familiar with the accepted and prevailing medical standards in the Murfreesboro community among physicians and obstetricians and that his examination of Mrs. Ayers fully complied with these standards. There is nothing in the record to refute Dr. Witt's affidavit.

Dr. Abramson's affidavits list the medical records which he reviewed and upon which he predicated his opinion expressed in his affidavits. He did not review any medical records concerning Mrs. Ayers' condition prior to her admission to Rutherford Hospital on August 13, 1975. His opinion, as stated in the affidavit, is that "Virginia Ayers, having a high risk pregnancy, in August, 1975, failed to progress normally in labor, should have been delivered by Cesarean section, however, was delivered by traumatic forceps which resulted in life long injury to her son, Cory Ayers."

Dr. Abramson's second affidavit is in slightly greater detail than his first affidavit. However, his opinion still pertains to Mrs. Ayers' labor in the hospital and the treatment she received while undergoing childbirth.

The Trial Judge for the reasons set out herein correctly sustained each defendant's motion for summary judgment.

The judgment of the Trial Court, therefore, is affirmed with costs assessed to plaintiffs and the cause remanded to the Trial Court for the collection of costs and any further necessary proceedings.

TODD, P.J., M.S., and CANTRELL, J., concur.