# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE
### January 5, 2001 Session

## SALLY QUALLS MERCER, ET AL. v. VANDERBILT UNIVERSITY, INC., ET AL.

### Appeal from the Circuit Court for Davidson County
### No. 98C-2936   Carol Soloman, Judge

---

### No. M2000-00801-COA-R3-CV - Filed December 5, 2002

---

This appeal involves a medical malpractice case arising out of the emergency treatment of an intoxicated driver who sustained catastrophic injuries in a single-vehicle accident. The driver's conservator filed suit in the Circuit Court for Davidson County alleging that the negligence of the driver's healthcare providers at Vanderbilt University Medical Center caused him to suffer irreversible brain injury that left him in a persistent vegetative state. A jury returned a verdict for the driver, assessing his damages at $7,366,000 and allocating seventy percent of the fault to Vanderbilt and thirty percent of the fault to the driver. Thereafter, the trial court determined as a matter of law that the driver's damages had been caused by a separate injury for which Vanderbilt was entirely responsible. Accordingly, the trial court set aside the jury's allocation of fault and entered a judgment holding Vanderbilt one hundred percent at fault for the entire amount of the driver's damages. We have determined that the judgment must be vacated and that Vanderbilt is entitled to a new trial because of the cumulative effect of the trial court's errors in excluding the testimony of three of Vanderbilt's witnesses as well as evidence of the driver's alcohol-related conduct.

### Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Circuit Court Reversed

BEN H. CANTRELL, P.J., M.S., WILLIAM C. KOCH, JR., J., AND WILLIAM B. CAIN, J.

Robert J. Walker and Steven E. Anderson, Nashville, Tennessee, for the appellant, Vanderbilt University, Inc., d/b/a Vanderbilt University Medical Center.

R. Dulin Kelly, Clinton L. Kelly and Andy L. Allman, Hendersonville, Tennessee, for the appellee, Sally Qualls Mercer, as conservator of the person of Larry Thomas Qualls.

### OPINION
### PER CURIAM

### I.

This is an action for damages for medical malpractice in the treatment of Larry T. Qualls, a thirty-six-year-old hemophiliac, who was severely injured in a single-vehicle accident on May 30, 1998. Mr. Qualls's injuries, mostly confined to his face and head, were horrendous. He suffered

fractures to most of his mid-face, including the bones around his eyes, cheek bones and jaw. His face and skull were separated, and some areas of his lungs were collapsed.

Mr. Qualls, who had a history of alcoholism, was rushed to Vanderbilt University Medical Center ("Vanderbilt"). His blood alcohol level tested at .13 percent four hours after the accident which extrapolated to .20 percent at the time his vehicle struck a tree. Treatment proved to be difficult because of the effects of the alcohol and Mr. Qualls's lack of cooperation. He suffered greatly from alcohol withdrawal which, at its worst stage, manifests itself as delirium tremens ("D.T.'s"). Mr. Qualls's condition required the administration of unusually large quantities of narcotic medication to palliate his struggles to extricate himself from restraints and to prevent extubation.

On the evening of June 2, 1998, Mr. Qualls was taken by nurse Linda Starks, respiratory therapist Karita Turner, and patient care partner Peggy Fowler, to the CT suite where he was connected to a portable ventilator to breathe for him and a portable monitor which recorded his heart rate and oxygen saturations. The portable monitor had alarm parameters designed to emit an audible alarm if the heart rate was too high or too low or if the oxygen saturations fell below a set level. The ventilator emits an audible alarm if it disconnects from its oxygen source, if the patient's airway is obstructed, or if the alarm is turned off.

After Mr. Qualls was positioned in the CT bed, Ms. Starks and Ms. Turner went to the control room of the CT suite in order to observe Mr. Qualls through a window. Above the computer controls was a color monitor which showed Mr. Qualls's face inside the scanner. Because of his agitation and combativeness, Mr. Qualls was medically paralyzed to prevent movement. The scan was completed in eight minutes, and Mr. Qualls was removed from the CT, looking the same as he did before the scan, *i.e.*, he had a pinkish color and was breathing with the aid of the ventilator. None of the three employees present heard an alarm from the ventilator or the portable monitor.

Ms. Starks and Ms. Turner testified that, within seconds of placing Mr. Qualls on his bed for transport upstairs to his room, they recognized that his condition had changed. Ms. Turner could not detect a pulse. One of the nurses said, "He's not breathing." Ms. Turner immediately started chest compressions, and Ms. Starks instructed Ms. Fowler who had recently re-entered the room to call a "STAT."[1] Ms. Starks then disconnected the ventilator and began administering pure oxygen through an ambu bag. Within one or two minutes, a "code" team consisting of ten or more physicians, nurses, and others who had expertise in resuscitative efforts arrived in the CT room and began life saving efforts. In about five minutes Mr. Qualls had a heartbeat and was stabilized.

Mr. Qualls's conservator presented expert testimony that Mr. Qualls suffered a brain injury as a result of the negligence of Ms. Starks and Ms. Turner who, having disarmed the alarms on the ventilator and portable monitor, failed to recognize that the ventilator had failed with disastrous consequences to Mr. Qualls.

---

[1] A "STAT" or "code" is a call for emergent resuscitative efforts. There are physicians and other health care providers designated to be a member of the "STAT" or "code" team.

One of the contested issues was causation. Vanderbilt presented expert testimony that Mr. Qualls likely suffered an irreversible brain injury as a result of a sudden, unexpected deterioration from the effects of delirium tremens. Dr. John Eichhorn, the chairman of anesthesiology at the University of Mississippi, testified that the precipitating event was a heart rhythm disturbance which resulted in heart stoppage. In his opinion this episode of arrhythmia was caused by Mr. Qualls's delirium tremens brought about by his chronic alcoholism or his acute intoxication at the time of his accident. Additionally, Dr. Ed Rutherford, a trauma surgeon at the University of North Carolina, testified that in his opinion the most likely explanation for the event in the CT scan room on the evening of June 2, 1998, was that Mr. Qualls suffered an abnormal heart rhythm or seizures, as a result of delirium tremens. Dr. Rutherford testified that there is a five to fifteen percent mortality rate as a result of D.T.'s.

The lead trauma surgeon, Dr. Van Natta, believed the most likely cause of Mr. Qualls's brain injury was a primary non-cardiac respiratory problem. He also testified that Mr. Qualls's injuries and his alcohol withdrawal as a result of acute intoxication were substantial factors leading to the event of the failed ventilator.

A veritable host of medical experts[2] in various disciplines testified concerning the issues of causation and negligence. A lesser host of non-medical witnesses testified. A detailed recitation of their testimony in this jury case would not be productive. The issue of causation was expounded upon and supported by diverse medical experts. Mr. Qualls's current vegetative state is uncontroverted.

The jury returned a verdict for $7,366,000 and allocated these damages seventy percent to Vanderbilt, and thirty percent to Mr. Qualls pursuant to the doctrine of comparative fault. Following the return of the verdict, Mr. Qualls's conservator moved for a judgment in accordance with her motion for a directed verdict made at the close of the evidence.[3] The trial court granted the motion and allocated one hundred percent of the fault to Vanderbilt after concluding that a "defendant in a medical malpractice action may not attribute fault to a plaintiff when the defendant creates a separate injury." Thereafter, Vanderbilt moved for a new trial or, in the alternative, for remittitur. The trial court denied the motion, and Vanderbilt has perfected this appeal.

## II.

Vanderbilt has appealed the trial court's final result to this court. On appeal, Vanderbilt raises the following issues:

- • Whether the trial court erred in granting plaintiff's motion for judgment in accordance with its motion for directed verdict, thereby setting aside the jury's finding of fault as to plaintiff and allocating all fault to Vanderbilt.

---

[2] Medical Drs. Van Natta, Cullinane, Folz, Deutsch, Mogelnicki, Rutherford, Winkler, Shaw, Rozear, Eichhorn, Elster, Cranford, plus nurses, and technicians, and four (4) Ph.D.'s.

[3] In this motion, Mr. Qualls's conservator sought to withdraw the consideration of comparative fault from the jury by requesting the trial court to find that Ms. Qualls's condition was caused by a separate injury for which Vanderbilt was one hundred percent at fault.

- Whether excluding the testimony of both plaintiff's treating physician and biomedical engineer employed by defendant constituted reversible error.

- Whether the trial court committed reversible error in excluding all evidence of Larry Qualls's prior alcohol-related conduct, including convictions for driving under the influence and aggravated assault and associated jail time.

- Whether the trial court's improper comment on the evidence and on the credibility of one of the eyewitnesses employed by Vanderbilt violated Vanderbilt's constitutionally guaranteed right to trial by jury.

- Whether the trial court's denial of defendant's motion to exclude plaintiff's expert testimony on life expectancy constituted reversible error.

- Whether the trial court's exclusion of expert testimony regarding the cost of an annuity to pay for Larry Qualls's future medical expenses constituted reversible error.

- Whether the jury instructions on emotional pain and suffering were proper.

In terms of relief, Vanderbilt seeks a new trial or "at a minimum" that the trial court's decision to allocate all the fault to Vanderbilt be vacated and the jury's allocation of fault be reinstated. As a practical matter, we turn our attention first to the issues raised by Vanderbilt which, if sustained, would justify sending this case back for a new trial. Courts may grant new trials where errors in the conduct of a trial combine to undermine the reliability of the final result. Here, Vanderbilt asserts that the trial court made several such errors. We must now review each of these alleged errors for ourselves. If we find that the trial court erred and that its errors, when we consider the whole record, more probably than not affected the final judgment, then we must vacate the trial court's decision and remand this case for a new trial to see that justice is done. *See*, *e.g.*, *Harbison v. Briggs Bros. Paint Mfg. Co.*, 209 Tenn. 534, 549-51, 354 S.W.2d 464, 471-72 (1962); *Herstein v. Kemker*, 19 Tenn. App. 681, 712, 94 S.W.2d 76, 95 (1936).

### III.
#### THE TRIAL COURT'S COMMENTS ON THE EVIDENCE

Vanderbilt asserts that the trial court improperly commented on the evidence. Tenn. Const. art. VI, § 9 provides that, "The judges shall not charge juries with respect to matters of fact, but may state the testimony and declare the law." In our jurisprudence, this constitutional command has been applied to prohibit judges from commenting on a case's evidence in matters tried to a jury. In keeping with that command, a trial judge must be "very careful not to give the jury any impression as to his [or her] feelings or to make any statement which might reflect upon the weight or credibility of evidence which might sway the jury." *State v. Eaves*, 959 S.W.2d 601, 605 (Tenn. Crim. App. 1997).

To protect the jury's fact-finding role, judges must be circumspect about expressing or intimating an opinion regarding any disputed question of fact. *Kanbi v. Sousa*, 26 S.W.3d 495, 498-99 (Tenn. Ct. App. 2000); *McCay v. Mitchell*, 62 Tenn. App. 424, 448, 463 S.W.2d 710, 721 (1970). They must refrain from making statements that might reflect on the weight of the evidence or the credibility of the witnesses or that might otherwise influence the jury concerning the facts. *State v. Suttles*, 767 S.W.2d 403, 406-07 (Tenn. 1989); *McBride v. Allen*, 720 S.W.2d 459, 462-63 (Tenn. Ct. App. 1979). These restrictions apply to comments made when ruling on objections. *Loeffler v. Kjellgren*, 884 S.W.2d 463, 474 (Tenn. Ct. App. 1994); *Bass v. Barksdale*, 671 S.W.2d 476, 488 (Tenn. Ct. App. 1984).

While judges must be circumspect in this area, not every comment on the evidence made by a judge in a jury proceeding is per se grounds for a new trial. When a dispute arises, reviewing courts look at the trial court's comments in context and weigh them for their likely effect -- whether the improper comments "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App. P. 36(b); *Kanbi v. Sousa*, 26 S.W.3d at 499. The party complaining of an improper comment by a judge ordinarily must show that the comment was, within practical certainty, unfairly prejudicial. *State v. Caughron*, 855 S.W.2d 526, 536-37 (Tenn. 1993); *Trentham v. Headrick*, 35 Tenn. App. 330, 337, 245 S.W.2d 632, 635 (1950). If the party is unable to show unfair prejudice, a trial court's comments will generally not constitute reversible error. *See, e.g.*, *Kanbi v. Sousa*, 26 S.W.3d at 499; *State ex rel. Comm'r v. Williams*, 828 S.W.2d 397, 403 (Tenn. Ct. App. 1991).

In this case, the trial court's allegedly improper comment came about in this way. The witness was Ms. Fowler, the patient care partner working with Mr. Qualls on the evening of June 2, 1998. She was responsible for taking him to the CT suite where the event of oxygen deprivation occurred. Ms. Fowler had left the CT suite to obtain new linens for Mr. Qualls and returned after the scan was completed. The relevant questioning of Ms. Fowler and the trial court's comment were as follows:

> Q. All right. And now tell the Jury what you saw when you came back. And I assume that you had gone to get the linens?
>
> A. [MS. FOWLER]   Yes.
>
> Q. And can you remember how long it was that it took you to do that?
>
> A. I do not know.
>
> Q. Well, I mean, tell us what you did. Did you just go up to the floor and grab the linen and come straight back down?
>
> A. Yes.

* * * * *

Q. When you came back down, was the scan over?

A. I do not remember that.

Q. Do you remember telling me in your deposition that it was?

A. Okay. I'm sorry. If – what I remember was that everyone was in the scan room itself, standing around the bed when I came back.

Q. All right. In fact, you told me that everybody was – when you came back, was standing around. Isn't that what you said?

A. They were standing around the bed.

Q. All right. Let me just – I'm –

A. I'm sorry.

Q. Let me show you, Ms. Fowler, what you said when I took your deposition back in May. It's Page 24. And let's see if you still remember it that way today. Line 12.

A. Line 12.

Q. You see where I asked you, "Tell me what you saw when you came back; you said the scan was over?"

A. Yes.

Q. And your answer is what?

A. "Everyone was standing around."
When I said that, sir, I meant around the bed.

Q. I know, but you remember me asking you in the beginning to tell me, answer my question to the best of your knowledge and information, remember that?

A. (Witness moves head up and down.)

Q. And I think I asked you two or three times if the people were standing around, and you never did tell me they were standing around the bed, you said "standing around"?

A. I'm sorry.

Q. Do you wish to change that in some way?

A. What – when I said "standing around," the way the control room is set up – not the control room – excuse me – the CT room is set up, it is set up so that there is room on one – both sides of the bed to stand. And when the patient, the person, medical personnel was there, there was someone at the head of the bed, on both sides, and one at the foot.

Q. On this –

A. – I'm sorry. Go ahead.

Q. I'm sorry. I thought you were through.

* * * * *

Q. Finish, please.

A. What I remember from that was that the CT scan operator, Wayman, was standing at the foot of the bed which would have said both the respiratory therapist and the nurse were at the head of the bed. I didn't mean standing around such as milling around. They were standing around the bed.

Q. When I asked you that again, because I was really under – you know, I wanted to make sure. So at Line 21, I said to you, "And you say everybody was standing around; where were they" – excuse me. Because I want to make sure when I asked you that question, "In the back where the table part was?"
And you said, "Back where the CT scanner is, yes."
And then I said, "Okay, they were back in where Mr. Qualls was."
And you said, "Yes."
And I said, "And they were standing around?"
And you told me again, "Yes."

A. They were standing around him.

Q. Because they were waiting on you to come back with the linens –

A. Yes.

Q. – to change the bed, weren't they, Ms. Fowler?

-7-

A.     Yes.

Q.     That's why you went up there. Everybody knew. In fact, you had to ask Ms. Starks if it was all right for you to leave to do that?

A.     Yes.

Q.     They were all standing around waiting for you to bring the linens back to change Mr. Qualls' linen.

MR. ANDERSON:     Objection to the leading, Mr. Kelly is leading and he doesn't have a right to.

THE COURT:     *Overruled because I'll rule this witness is a hostile witness, changing her testimony from* – [emphasis added]

THE WITNESS:     I'm sorry.

MR. DULIN KELLY:     Let me rephrase it, Your Honor.

THE COURT:     All right.


BY MR. DULIN KELLY:

Q.     What was the reason that the people were standing around, waiting for you to come back?

A.     It normally takes four people to move a patient from the bed to the scanner.

Q.     So they were waiting for you to come back to help them move from table to bed?

A.     Yes.

Q.     Somebody knew you had gone to get linen to change the bed, is what –

A.     Yes.

Q.     And when you came back, that's what you thought they were waiting on?

A.     Yes.

Vanderbilt now objects to the trial court's remark in the jury's presence that Ms. Fowler was "changing her testimony" at trial from what she had testified to in her pretrial deposition. We agree with Vanderbilt that the trial court's comment, no matter how she may have subjectively meant it, may have sounded like an appraisal of Ms. Fowler's credibility.[4] To a reasonable jury, the trial court's remark, coming when it did, could have signaled that the trial court thought the witness was trying to "refine" her testimony at trial to make it more favorable to Vanderbilt than it originally had been.

The trial court's comment is more than an inconsequential remark in the context of this case. We cannot close our eyes to the fact that Mr. Qualls's conservator was traveling largely on a theory that the oxygen tank on the ventilator employed during Mr. Qualls's CT scan ran out of oxygen and that Vanderbilt was trying to cover up that fact. The conservator made Vanderbilt's credibility an important issue in the case, arguing to the jury that, "[t]his case is all about credibility," and "[t]hat's their story, [a]nd I'll ask you [the jury] to tell us when you come back whether you think that's credible or not." The conservator walked right up to the line of accusing Vanderbilt of a cover-up, saying that the alarm on the ventilator failed to sound because it had been disengaged, "[b]ut they're not going to tell you that, because that's bad . . .." The truthfulness issue was so central to the case that Vanderbilt's lawyer spent the first part of his closing argument trying to debunk any cover-up theory. He suggested to the jury that it would be an extreme notion that all the medical personnel "were lying."

When we place the trial court's seeming aspersion on Ms. Fowler's truthfulness in the context of how this case was argued, we cannot find that the trial court's comment on the evidence was harmless. That, however, is not the end of the analysis. Mr. Qualls's conservator argues forcefully that Vanderbilt failed to make a contemporaneous objection to the trial court's improper comment, failed to ask for a "jury out" session to discuss the matter before Ms. Fowler left the stand, failed to move for a mistrial, and failed to seek a curative instruction. The conservator asserts that all Vanderbilt did was enter a dead-end objection to the comment at the conclusion of Ms. Fowler's testimony. We must, therefore, determine whether Vanderbilt is entitled to seek a new trial on this point of error.

It is a well-established rule that "a party must complain and seek relief immediately after the occurrence of a prejudicial event." *Gotwald v. Gotwald*, 768 S.W.2d 689, 694 (Tenn. Ct. App. 1988). Where appropriate, the party must make a contemporaneous objection. A contemporaneous objection is one made during the trial on the record upon specific grounds at the time that the grounds for objection become apparent. *State v. Stuit*, 885 P.2d 1290, 1294 (Mont. 1994). A contemporaneous objection does not always mean an immediate "jump up" objection. *See*, *e.g.*, Tenn. R. Evid. 614(c). Counsel's need to "jump up" depends on the nature of what is being objected

---

[4]In a discussion with counsel outside of the jury's presence immediately after Ms. Fowler's testimony, the court told the lawyers: "I think she committed blatant perjury." Our understanding of the proceedings is limited to the written record, we cannot deduce any hostility on Ms. Fowler's part from her responses. Nor do we gleam from this sequence of questions and answers that the perceived divergence between Ms. Fowler's testimony at her deposition and at trial was significant.

to. Here, the minute the conservator's lawyer concluded his cross-examination of Ms. Fowler, Vanderbilt's lawyer requested an opportunity to address the court without the jury present and then objected on the record to the court's remark that Ms. Fowler was "changing her testimony."[5] Given the nature of the objectionable occurrence, that constituted a contemporaneous objection for the purpose of this case.

Vanderbilt did not seek a mistrial after it objected to the trial court's remark about Ms. Fowler. We do not fault Vanderbilt for this decision. Generally speaking, a mistrial is a drastic remedy that should be employed only when some event has occurred during a trial that will prevent the jury from returning an impartial verdict. *State v. Williams*, 929 S.W.2d 385, 388 (Tenn. Crim. App. 1996). Granting a mistrial is within the court's discretion. *Newman v. Simmons*, 62 Tenn. App. 610, 621, 466 S.W.2d 506, 511 (1970). A mistrial may have been overkill in this case, given the context of the trial court's comment about Ms. Fowler's testimony.

When an improper matter is injected into a jury trial, and the wronged side successfully objects, trial courts will often cure the error by giving a curative instruction. *See*, *e.g.*, *Colquit v. State*, 107 Tenn. 381, 385-86, 64 S.W. 713, 714 (1901); *West End Recreation, Inc. v. Hodge*, 776 S.W.2d 101, 103 (Tenn. Ct. App. 1989). Curative instructions allow a trial court to correct possible damage. The trial court explains to the jury how to process the prejudicial matter in arriving at its decision. Juries are presumed to follow curative instructions in all cases where giving a curative instruction is reasonably appropriate. *State v. Hall*, 976 S.W.2d 121, 148 (Tenn. 1998); *Crafton v. State*, 545 S.W.2d 437, 439-40 (Tenn. Crim. App. 1976).

Appellate courts find curative instructions to be efficacious. Neil P. Cohen *et al.*, *Tennessee Law of Evidence* § 1.05[4] (4th ed. 2000). At the same time, we recognize that curative instructions may not always result in "automatic cure" in every case. *Ledford v. State*, 568 S.W.2d 113, 119 (Tenn. Crim. App. 1978) (Dwyer, J., dissenting). We have examined a number of cases on the specific point involved here – the efficacy of curative instructions where trial courts have improperly commented on evidence. In some cases curative instructions will not suffice to correct the damage created by a trial court's incursion into the jury's province. As one federal court has noted, "There may be cases in which the trial judge's comments are so out of bounds that no cautionary instruction to the jury could remove their prejudicial effect." *United States v. Olgin*, 745 F.2d 263, 269 (3d Cir. 1984). However, in most instances the decision must turn on the facts and circumstances of each case. In deciding whether an improper comment is beyond correction, the courts must consider the comment in context, not in isolation. Courts must consider whether the comment was on a matter central to the case. Courts should also consider whether the comment was so emphatic or overbearing that the jury decided to consider the trial court's comment in reaching its decision. *United States v. Olgin*, 745 F.2d at 269.

---

[5]At the conclusion of Ms. Fowler's testimony, the defendant made this objection:

MR. ANDERSON:          Your Honor, let me say, though, for the record, and I say this with all due respect. The Court's comments, she changed her testimony, in front of the jury, we object to.

THE COURT:          Understand. All right.

Some comments on the evidence turn out to be harmless error. *See*, *e.g.*, *Kanbi v. Sousa*, 26 S.W.3d at 499; *State ex rel. Comm'r v. Williams*, 828 S.W.2d at 403. Other comments can be remedied by giving curative instructions. *See*, *e.g.*, *Bohanon v. Jones Bros.*, No. M1998-00954-COA-R3-CV, 2002 WL 256798, at *4-6 (Tenn. Ct. App. Feb. 22, 2002) (No Tenn. R. App. P. 11 application filed); *State v. Gregg*, 874 S.W.2d 643, 644 (Tenn. Crim. App. 1993). An instruction to ignore the comment "generally cures any error" unless the improper comment was so prejudicial that it more probably than not affected the judgment in the case. *State v. Tyler*, 598 S.W.2d 798, 802 (Tenn. Crim. App. 1980). For us to find that a curative instruction did not restore a trial's integrity, "real doubt [must be] raised as to whether the judicial warning against [the comment's] consideration was effective." *Blankenship v. State*, 219 Tenn. 355, 359, 410 S.W.2d 159, 160-61 (1966).

We agree with Vanderbilt that the trial court's comment about Ms. Fowler bore on a central theory in the plaintiff's case – that Vanderbilt was being dishonest about what happened to Mr. Qualls during the CT scan. However, we decline to conclude that the trial court's comment was so emphatic or admonitory that it left the jury with the impression that it was not free to form its own opinion of Ms. Fowler's testimony. For example, the trial court's remark, though improper, was not as punctuated as the trial judge's comment in *McCay v. Mitchell*, 62 Tenn. App. 424, 447, 463 S.W.2d 710, 721 (1970), where an expert witness was cross-examined concerning whether his response to a question at trial differed from testimony given during discovery. The trial court interrupted with this comment:

> He's saying that today, . . . that's exactly the way he had testified here today. Now let's use that, where his testimony is inconsistent in that deposition, and what he had testified to today . . .

There we held that the trial judge's characterization of the witness's testimony could not be harmless error. *McCay v. Mitchell*, 62 Tenn. App. at 447-48, 452, 463 S.W.2d at 721, 723; *see also State v. Eaves*, 959 S.W.2d at 604-05 (reversing where the trial judge in open court cautioned a witness about perjury). In this case, the trial court's injudicious characterization of Ms. Fowler's testimony could have been remedied by a curative instruction.

Ordinarily, a trial court should consider giving a curative instruction when a material error has been objected to. If the trial court does not itself offer such a corrective charge, counsel has a duty to request one, rather than let a potentially prejudicial error go until it is too late to be remedied. *State v. Griffis*, 964 S.W.2d 577, 599 (Tenn. Crim. App. 1997); *State v. Mackey*, 638 S.W.2d 830, 835-36 (Tenn. Crim. App. 1982); *Ison v. McFall*, 55 Tenn. App. 326, 365-66, 400 S.W.2d 243, 261 (1964). As we have said repeatedly, parties cannot use errors committed during a trial as their "ace in the hole" to be subsequently played should they not like the trial result. *Davis v. State Dep't of Employment Sec.*, 23 S.W.3d 304, 313 (Tenn. Ct. App. 1999); *Harwell v. Walton*, 820 S.W.2d 116, 120 (Tenn. Ct. App. 1991).

After objecting to the trial court's remark, Vanderbilt not only did not ask for a curative instruction, it also refused the trial court's offer to make such an instruction. Outside of the jury's presence, the trial court told Vanderbilt's lawyer:

> Mr. Anderson, my comments about -- my one comment about
> allowing Mr. Kelly to further examine and lead [Ms. Fowler] who
> had changed her testimony from the deposition to the trial was exactly
> that. I was explaining why I was allowing him to lead, because of the
> change in the testimony. It was not commenting on her truthfulness.
> Would you like me to explain that to the jury?"

To which one of Vanderbilt's lawyers replied, "No, your honor." Under Tenn. R. App. P. 36(a), counsel had a duty to try to seek mitigation of the harmful effect of the trial court's error as a prerequisite to relying on that error to seek relief on appeal. Vanderbilt's express declination of a curative instruction prevents it from relying on the trial court's improper comment on the evidence in this case as grounds to overturn the jury's verdict on appeal.

## IV.
### THE EXCLUSION OF WITNESSES BECAUSE OF VANDERBILT'S FAILURE TO SUPPLEMENT ITS INTERROGATORY ANSWERS

Vanderbilt also asserts that the trial court committed reversible error by excluding two witnesses slated to testify as part of its case. During pretrial discovery, Mr. Qualls's conservator served standard interrogatories on Vanderbilt seeking "the identity of each person who may have knowledge of the facts in this case." In its original response, Vanderbilt did not provide the names of either Dr. John Salyer, one of Mr. Qualls's treating physicians, or James Hutchison, a biomedical engineer. Vanderbilt later learned of both men but did not supplement its original interrogatory response to provide their names. When both parties exchanged witness lists five days before trial as required by the local court rules, Vanderbilt disclosed that it intended to call both Dr. Salyer and Mr. Hutchison as witnesses.

Mr. Qualls's conservator moved to exclude Dr. Salyer's and Mr. Hutchison's testimony on the grounds that Vanderbilt had failed to disclose their identities in response to pretrial discovery. The trial court determined that Mr. Hutchison's proposed testimony "would be central to this case and would be a surprise to the plaintiff if it was presented now." It reached the same conclusion with regard to Dr. Salyer's testimony and compared allowing both men to testify to "trial by ambush." Ultimately the trial court excluded Dr. Salyer from testifying because he was not identified and disclosed by Vanderbilt "in a timely fashion." Said the court, "I think that would be just so very prejudicial, I would have to continue this case to allow the plaintiff to examine that doctor and to perhaps get an expert."

The trial court excluded these two witnesses as a remedial measure for Vanderbilt's failure to disclose their identities during pretrial discovery.[6] Trial courts have inherent power to take corrective action to prevent discovery abuse. *Crowell v. Crowell*, No. E1999-00348-COA-R3-CV, 2000 WL 688568, at *7 (Tenn. Ct. App. May 30, 2000) *perm. app. denied* (Tenn. Mar. 12, 2001);

---

[6] It is important to note that Tenn. R. Civ. P. 26.02(1) allows parties to discover the identities of persons having knowledge about a case's facts, but the rule does not require a party to designate its trial witnesses. *Strickland v. Strickland*, 618 S.W.2d 496, 499 (Tenn. Ct. App. 1981); *Reed v. Allen*, 522 S.W.2d 339, 341 (Tenn. Ct. App. 1974); *see also* 3 Nancy F. MacLean, *et al.*, *Tennessee Practice* § 26:4 (3rd ed. 2000). Trial witnesses, as such, are not discoverable.

*Strickland v. Strickland*, 618 S.W.2d at 501. However, failure to respond fully to an adversary's discovery request does not in all cases prevent a witness from testifying. *Pettus v. Hurst*, 882 S.W.2d 783, 787 (Tenn. Ct. App. 1993). Trials are held to get at the truth in cases, and categorically excluding relevant evidence obviously hampers the judicial system's truth-seeking function. "Each time [an] exclusionary rule is applied it exacts a substantial social cost . . .. Relevant and reliable evidence is kept from the trier of fact and the search for truth at trial is deflected." *Rakas v. Illinois*, 439 U.S. 128, 137, 99 S. Ct. 421, 427 (1978). For that reason, excluding relevant evidence is an extraordinary step that courts should employ sparingly. *Kuehne & Nagel, Inc. v. Preston, Skahan & Smith Int'l, Inc.*, No. M1998-00983-COA-R3-CV, 2002 WL 1389615, at \*5 (Tenn. Ct. App. June 27, 2002) (No Tenn. R. App. P. 11 application filed); *Richardson v. Miller*, 44 S.W.3d 1, 21 (Tenn. Ct. App. 2000).

In deciding on an appropriate sanction for discovery abuse, trial courts should consider these factors: (1) the party's reasons for not providing the challenged evidence during discovery; (2) the importance of the evidence to the case; (3) the time needed for the other side to prepare to meet the evidence; and (4) the reasonableness of granting a continuance. *Lyle v. Exxon Corp.*, 746 S.W.2d 694, 699 (Tenn. 1988); *Pettus v. Hurst*, 882 S.W.2d at 787. Once the trial court has determined what it finds to be an appropriate sanction, appellate courts review that decision under an abuse of discretion standard. *Brooks v. United Uniform Co.*, 682 S.W.2d 913, 915 (Tenn. 1984); *White v. Vanderbilt Univ.*, 21 S.W.3d 215, 223 (Tenn. Ct. App. 1999). Under that standard we review to determine (1) whether the factual basis for the decision is supported by the evidence, (2) whether the trial court identified and applied the applicable legal principles, and (3) whether the trial court's decision is within the range of acceptable alternatives. *White v. Vanderbilt Univ.*, 21 S.W.3d at 223. Appellate courts ordinarily permit discretionary decisions to stand even though reasonable judicial minds can differ concerning their soundness. *Overstreet v. Shoney's, Inc.*, 4 S.W.3d 694, 709 (Tenn. Ct. App. 1999).

## A.

We turn first to the exclusion of Dr. Salyer's testimony. While Mr. Qualls's conservator may have viewed Dr. Salyer as a "surprise witness," we disagree that Vanderbilt abused the discovery process in how it handled Dr. Salyer. Dr. Salyer was a treating physician and was in charge of Mr. Qualls's care while he was a patient in NHC nursing home following his discharge from Vanderbilt. Vanderbilt learned of Dr. Salyer from Mr. Qualls's conservator. During discovery, the conservator produced Mr. Qualls's medical records from NHC, including multiple clinical notes prepared by Dr. Salyer. Keying in on those notes, Vanderbilt interviewed Dr. Salyer, discovered that his testimony was relevant on the question of damages, and decided to call him as a witness. There was nothing improper about that. Entirely apart from any discovery provided by Vanderbilt, Dr. Salyer was known to Mr. Qualls's conservator before this case was tried as someone who may have had knowledge of this case's facts. The conservator did not need Vanderbilt to identify Dr. Salyer because she already knew his identity. Vanderbilt's reasons for not supplementing its interrogatory answers to identify Dr. Salyer are not blameworthy on this point.

We also agree with Vanderbilt that Dr. Salyer's excluded testimony potentially mattered on the issue of damages. Mr. Qualls's conservator introduced a significant amount of testimony criticizing the care provided to him at the NHC facility. Moreover, at least two of the plaintiff's

expert witnesses testified that, in their opinions, he would be better cared for in a home setting. Dr. Salyer, however, was of the opinion that Mr. Qualls remained in a persistent vegetative state, that the NHC facility provided good care, that the nursing home would be the best setting for Mr. Qualls, that Mr. Qualls requires access to a physician twenty-four hours a day, that he would not have had such access in a home setting, and that, had the family attempted to discharge him to a home setting, the discharge would have been against his medical advice. This testimony is relevant on damages. The evidence showed that the difference in the cost of care at NHC versus the cost of care in a home setting, as advocated by plaintiff's expert, was approximately $238,967 per year. Had the jury heard the opinions of Dr. Salyer -- a witness who had real experience in the care of Mr. Qualls -- it could very well have chosen a different, lower figure for part of the damages.

When we look at the time the plaintiff may have needed to respond to Dr. Salyer's testimony, that time would have chiefly been just whatever time it would have taken to prepare cross-examination of a trial witness. It might have necessitated ending a day of testimony early to give plaintiff's counsel overnight to work up a good cross-examination on what Dr. Salyer had said. As remedies go, that would have more nearly furthered justice than did the remedy elected by the circuit court -- prohibiting Dr. Salyer's testimony altogether. Considering all the factors, we hold that the trial court went too far in excluding Dr. Salyer as a witness.

**B.**

The situation of Mr. Hutchison is not as straightforward. Mr. Hutchison is a biomedical engineer employed at Vanderbilt. According to Vanderbilt, Mr. Hutchison checked all of the equipment, including the ventilator, involved in Mr. Qualls's CT scan within a few days after Mr. Qualls took the scan. Vanderbilt asserts that had Mr. Hutchison been allowed to testify, he would have told the jury several facts that might have undercut the plaintiff's theory of causation.[7] For instance, he was prepared to say that had the oxygen supply to the ventilator started to run out, an intermittent alarm would have sounded for two to four minutes before the oxygen tank ran dry and that the alarm would have sounded more frequently as the oxygen level lowered. Finally, he would have testified that a second alarm sounds when the oxygen runs out completely. No other witness presented those facts to the jury. The jury could have weighed this evidence against the plaintiff's theory that three people -- Ms. Starks, Ms. Turner, and CT technologist Waymon Bean -- failed to hear or ignored all these alarms and took no action to protect Mr. Qualls. According to Vanderbilt, this was pivotal evidence for the jury to consider. We agree that it had some importance, if we accept for argument's sake, Vanderbilt's theory of the case.

The determinative factor for excluding Mr. Hutchison, as we see it, becomes whether Vanderbilt identified him to the plaintiff during discovery as someone having knowledge of the facts of this case. Mr. Qualls's conservator does not dispute that on April 26, 1999, her lawyer, her lawyer's nurse consultant, and defense counsel met Mr. Hutchison face-to-face to allow the conservator's lawyer to interview him about the alarm system on the CT scan monitor and ventilator.

---

[7]Mr. Qualls's conservator presented evidence and argued to the jury that the oxygen connected to the ventilator ran out, that the alarms on the ventilator either were not heard or were ignored, and that he was injured as a result.

Mr. Hutchison was not someone with personal knowledge[8] of the actual events involved in Mr. Qualls's June 2, 1998 CT scan, but he did know how the machine would have alarmed had the ventilator run out of oxygen. The conservator's lawyer knew that Mr. Hutchison knew that. And that was all that Mr. Hutchison proposed to testify about at trial. The plaintiff had a free and clear opportunity while meeting with Mr. Hutchison to find out everything Mr. Hutchison knew about the ventilator and about this case. We disagree with the trial court's view that somehow Vanderbilt kept the plaintiff in ignorance either about Mr. Hutchison or about Mr. Hutchison's knowledge of facts relevant to this case.

In excluding Mr. Hutchison's testimony, the trial court was influenced by its jaundiced view of what it called "the strange letter and agreement" between opposing counsel regarding taking discovery from Mr. Hutchison and biomedical engineers generally. During pre-trial discovery, plaintiff's counsel asked opposing counsel if he, along with his client and a nurse consultant, could meet with someone at Vanderbilt who could demonstrate how the portable cardiac monitor and portable ventilator worked. Defense counsel wrote plaintiff's counsel on April 23, 1999, just prior to the commencement of depositions, informing him that Vanderbilt would make available to him someone to answer all the questions he had about the equipment, but only if he agreed not to depose any other biomedical engineer throughout the pendency of the case. The letter stated, "If you change your mind or you do not think this adequately sets forth our understanding, please notify me immediately." The conservator's lawyer accepted that arrangement and subsequently interviewed Mr. Hutchison. Later, the lawyer asserted that he would have deposed Mr. Hutchison had he known that Vanderbilt intended to call him to testify at trial.

We re-emphasize, however, that Tenn. R. Civ. P. 26.02(1) did not entitle Mr. Qualls's conservator to discover whether Vanderbilt planned to call Mr. Hutchison as a witness. Vanderbilt's only obligation was to disclose Mr. Hutchison's identity. It did so. Vanderbilt never informed Mr. Qualls that Mr. Hutchison would not be a witness, and the lawyers' letter agreement was not tantamount to an agreement that Mr. Hutchison would not be called at trial. We reject the trial court's reasoning that the letter agreement was "an implied promise that the biomedical engineer would be available for information but would not be used at trial."

Mr. Qualls's conservator finally argues that the exclusion of Mr. Hutchison's testimony was harmless because it was cumulative to the testimony of other witnesses or to stipulations. We disagree. As Vanderbilt points out, while there was testimony that an alarm sounds on the ventilator when the oxygen supply is totally depleted, no other witness offered testimony about the two to four minute intermittent alarm attached to the ventilator which sounds when the oxygen supply is running low. No other witness testified that the intermittent alarm sounds more and more frequently as the oxygen supply is depleted or that another alarm sounds when the oxygen is totally depleted. Additionally, no other witness testified that the portable cardiac monitor was not capable of printing out a cardiac rhythm strip. No other witness clearly explained how the medical equipment worked together in providing medical personnel with warnings. We conclude that the trial court excluded Mr. Hutchison on erroneous grounds and that his testimony was not merely cumulative evidence.

---

[8]*See* Tenn R. Evid. 601 and 602 (stating that a person generally cannot testify for the purposes of establishing facts of which he or she has no personal knowledge).

# V.
## THE EXCLUSION OF THE ANNUITIST'S TESTIMONY

In addition to excluding the testimony of Dr. Salyer and Mr. Hutchison, the trial court excluded the testimony of Bruce Wolfe, a structural annuity specialist, offered by Vanderbilt on the question of damages. Vanderbilt maintains that an annuity could have been purchased to ensure a stream of cash payments to cover Mr. Qualls's future medical expenses for the rest of his life. Mr. Wolfe would have testified about the cost of such an annuity policy. The trial court disallowed this evidence as "too speculative." The question of admitting an annuitist's testimony in a personal injury case is one of first impression in Tennessee.

In cases involving permanent injury, future medical expense damages are customarily measured by the estimated cost of providing reasonable and necessary injury-related medical care over a future period corresponding to the injured person's actuarial life expectancy. *See generally* Mayo L. Coiner, *Tennessee Law of Damages* §§ 9-2, 9-13 (1988). In making an actual award, the fact-finder should arrive at an amount for these damages and then reduce that amount to its present cash value. *See Waller v. Skeleton*, 31 Tenn. App. 103, 126, 212 S.W.2d 690, 700 (1948) (noting that the law allows a plaintiff but one action for damages, therefore, all compensation, including compensation for the future, must be awarded in the judgment); 2 Dan B. Dobbs, *Law of Remedies* § 8.5(3) (2nd ed. 1993) ("Dobbs"). In this context, "present cash value" means the sum of money presently needed, which, when added to what that sum may reasonably earn in the future when invested, would equal the amount of medical expenses when the expenses must be paid. Determining this type of present value involves discounting not a single future sum but rather discounting a stream of payments due medical providers in the future. 2 Dobbs § 8.5(3), at 470.

Lawyers who have experience with this question have explained how evidence available from an annuitist can assist fact-finders in reducing future economic damages to their present value:

> In the majority of American jurisdictions, juries are required to reduce awards for prospective economic damages to their present cash value. For most jurors, this is an unfamiliar concept that becomes especially difficult to apply when conflicting evidence . . . is introduced. . . . One particularly effective method for educating the jury on this subject is through the use of an annuitist at trial. An annuitist can be described as one who, through education and experience, is knowledgeable about the costs and availability of commercial annuity products. Annuity salesmen, insurance brokers, and actuaries may fit the general description of an annuitist, depending on their individual qualifications. . . . [T]he commercial annuity is a contract that, in exchange for the present payment of a premium, guarantees that specified payments will be made to the annuitant at some date or dates in the future. In concrete terms, the premium required to purchase an annuity now represents the present cash value of the income payments the annuity is designed to produce in the future. Using evidence of the plaintiff's anticipated loss as a starting point, the annuitist refers to current annuity premium tables to establish

what it costs now to provide the stream of income that will be required by the plaintiff in the future. Unlike the plaintiff's economist, the annuitist need not speculate on future economic trends nor make any assumptions regarding future interest rates, inflation, or the individual plaintiff's needs. . . [B]ased on the plaintiff's own estimate of his or her future needs, or on estimates from the defense medical team, the annuitist simply determines the cost of a commercially available annuity that will produce a stream of income corresponding to the plaintiff's requirements.

Kevin Campbell & Bradley Nahrstadt, "Refuting Damages in a Personal Injury Case: Bolster the Defense by Developing a Strong Economic Team," *The Brief*, at 11-12 (Spring 1995) ("Campbell & Nahrstadt"). The cost of a commercial annuity contract can "demonstrate to the jury an actual marketplace investment that will produce the indicated amounts required in the future when they are needed by the plaintiff. Evidence of the cost of such an annuity not only suggests the concept of present cash value in meaningful and understandable terms, it also suggests a benchmark for the jury's computation of present cash value." Campbell & Nahrstadt, at 12.

In tort cases, the proof of damages need not be exact or mathematically precise. *Provident Life & Accident Ins. Co. v. Globe Indem. Co.*, 156 Tenn. 571, 576, 3 S.W.2d 1057, 1058 (1928); *Airline Constr. Inc. v. Barr*, 807 S.W.2d 247, 274 (Tenn. Ct. App. 1990). Rather, the proof must be as certain as the nature of the case permits and must enable the trier of fact to make a fair and reasonable assessment of the damages. *Pinson & Assocs. Ins. Agency, Inc. v. Kreal*, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990); *Wilson v. Farmers Chem. Ass'n*, 60 Tenn. App. 102, 111, 444 S.W.2d 185, 189 (1969). The amount of damages is not controlled by fixed rules of law, *Blalock v. Temple*, 38 Tenn. App. 463, 470, 276 S.W.2d 493, 497 (1954), or mathematical formulas. *Brown v. Null*, 863 S.W.2d 425, 429-30 (Tenn. Ct. App. 1993). It is instead left to the sound discretion of the trier of fact. *Reeves v. Catignani*, 157 Tenn. 173, 176, 7 S.W.2d 38, 39-40 (1928); *Sholodge Franchise Sys., Inc. v. McKibbon Bros., Inc.*, 919 S.W.2d 36, 42 (Tenn. Ct. App. 1995).

Damages may never be based on mere conjecture or speculation. *Western Sizzlin, Inc. v. Harris*, 741 S.W.2d 334, 335-36 (Tenn. Ct. App. 1987); *Nashland Assocs. v. Shumate*, 730 S.W.2d 332, 334 (Tenn. Ct. App. 1987). However, uncertain or speculative damages are prohibited only when the existence, not the amount, of damages is uncertain. *Jennings v. Hayes*, 787 S.W.2d 1, 3 (Tenn. Ct. App. 1989); *Cummins v. Brodie*, 667 S.W.2d 759, 765 (Tenn. Ct. App. 1983). Evidence required to support a claim for damages need only prove the amount of damages with reasonable certainty. *Airline Constr., Inc. v. Barr*, 807 S.W.2d at 274; *Redbud Coop. Corp. v. Clayton*, 700 S.W.2d 551, 561 (Tenn. Ct. App. 1985).

Mr. Qualls's conservator points to several cases from other jurisdictions where courts have disallowed the testimony of annuitists. However, many of those cases excluded the evidence on grounds other than its supposed speculativeness. *See*, *e.g.*, *Farmers Union Federated Coop. Shipping Ass'n v. McChesney*, 251 F.2d 441, 442 (8th Cir. 1958) (excluding the evidence on grounds that the premium charged for a commercial annuity includes an amount for the administrative cost and profit of the issuing company) and *Gregory v. Carey*, 791 P.2d 1329, 1332-33 (Kan. 1990)

(excluding a particular annuitant's testimony as hearsay). Most of the cases that Mr. Qualls's conservator cites on this issue are not helpful on the exact question before us.[9]

In our view the most glaring conventional weakness of annuitist testimony is its potential to mislead, depending on how annuity information is presented. When an annuitist testifies regarding the cost of an annuity, he or she is acting like an insurance agent. The annuitist passes on medical information to an insurance company for the purpose of obtaining a quote or estimate of the annuity price. He or she then delivers that quote to the jury even though policy prices are limited to a fixed period of time and are subject to subsequent rate changes. There is no enforceable contract to bind the insurance company to the quote. Before making a final decision as to the rate charged for the annuity, the insurance company would review the actual medical file of the plaintiff, which could result in a different underwriting decision. Also, rates obtained for annuities prior to trial may be dramatically different from the quotes that would be available after an appeal is resolved. Market forces can change rates irrespective of the health or age of the plaintiff. The premium quoted by the annuitist might not actually be available to an injured person by the end of a hard-fought case.

This weakness in annuity evidence, however, goes to its weight, not its admissibility. *Cf. McCarley v. West Quality Food Serv.*, 960 S.W.2d 585, 588 (Tenn. 1998); *Kim v. Boucher*, 55 S.W.3d 551, 556 (Tenn. Ct. App. 2001); *State v. Spratt*, 31 S.W.3d 587, 604 (Tenn. Crim. App. 2000). The opponent of annuity evidence remains free, once the annuitist testifies, to bring out before the fact-finder by cross-examination and argument all weaknesses in this type of evidence, including placing before the jury the actual available duration of any premium quotation.

An annuitist's testimony is not controlling on the fact-finder. However, the evidence is relevant and may be considered on the question of damages along with all the other relevant evidence on that question. *See Scott v. United States*, 884 F.2d 1280, 1287-88 (9th Cir. 1989) (allowing annuity evidence); *Thompson v. Camp*, 163 F.2d 396, 403 (6th Cir. 1947) (same); *Ramrattan v. Burger King Corp.*, 656 F. Supp. 522, 523-24 (D. Md. 1987) (same); *Southlake Limousine & Coach, Inc. v. Brock*, 578 N.E.2d 677, 682-85 (Ind. Ct. App. 1991) (same); *Cornejo v. State*, 788 P.2d 554, 559-63 (Wash. Ct. App. 1990) (same); *see also* 2 Dobbs § 8.5(5) at 483 (pointing out the accepted, common use of annuities to fund structured personal injury settlements).

We find that the trial court erred by excluding Mr. Wolfe's testimony on the ground that it was too speculative. We also find that this error was not harmless because it directly related to the hotly contested question of damages. Accordingly, the exclusion of Mr. Wolfe's testimony was reversible error.

---

[9] The appellee's brief characterizes the exclusion of an annuitist's testimony as "the majority view." The majority view is not clear; others have characterized admissibility of annuitist evidence as the majority view. *See* Campbell & Nahrstadt, at 12. One thing, however, is clear: no majority of jurisdictions holds that such evidence is inadmissible as "too speculative."

-18-

# VI.
## THE EXCLUSION OF MR. QUALLS'S ALCOHOL-RELATED CONDUCT

The next issue presented for review is whether the trial court erred by excluding "all evidence of Mr. Qualls' alcohol-related conduct, including conviction for driving under the influence, aggravated assault and associated jail time." Mr. Qualls was thirty-six years old. He was married, although separated, with two young children. He was employed at a lumber yard as a kiln operator. The record contains substantial evidence that he was an alcoholic.[10]

The trial judge refused to admit as irrelevant proffered testimony that Mr. Qualls drove a motor vehicle on April 13, 1996 [two years before he was injured] while intoxicated, and accompanied by his children; that his blood alcohol exceeded .10 percent; that he pleaded guilty and was sentenced to jail; that in 1997 he was charged with assaulting his wife while intoxicated and resisting arrest to which he pleaded guilty. Mr. Qualls's life expectancy and lost earning capacity were important issues. Even a moment's reflection leads to the conclusion that alcohol abuse is life threatening, as well as life shortening.

Tenn. R. Evid. 401 defines relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence."

Mr. Qualls's conservator, relying on *Mankey v. Bennett*, 38 F.3d 353 (7th Cir. 1994), argues that since Vanderbilt offered no expert proof establishing a nexus between the proffered evidence and Mr. Qualls' health or earning capacity, relevance was not established. We cannot agree because of the plain wording of Tenn. R. Evid. 401 that in wrongful death cases, evidence of personal habits respecting sobriety and honesty has traditionally been admitted as relevant to the issues of earning capacity and life expectancy. *See, e.g., Spencer v. A-1 Crane Service, Inc.*, 880 S.W.2d 938, 943 (Tenn. 1994); *Hensley v. Harbin*, 782 S.W.2d 480, 481 (Tenn. Ct. App. 1989). The logicality of the reasoning in wrongful death cases may be applied in this horrendous injury case since the issues of life expectancy and earning capacity are the same. Accordingly, we agree with Vanderbilt that the evidence regarding Mr. Qualls's alcohol abuse was admissible and that the trial court erred by excluding it.

# VII.
## THE ADMISSIBILITY OF EVIDENCE REGARDING MR. QUALLS'S LIFE EXPECTANCY

Vanderbilt next argues that the trial court erred by allowing three expert witnesses to testify concerning Mr. Qualls's life expectancy in light of the fact that he is in a persistent vegetative state. The relevancy and competency of expert testimony is a matter involving the discretion of the trial court. *McDaniel v. CSX Trans., Inc.*, 955 S.W.2d 257, 263 (Tenn. 1997). We cannot find from this record that the trial court abused its discretion by allowing the experts to testify regarding Mr. Qualls's life expectancy. Moreover, we take note of the cross-examination of each expert which detracted considerably from the weight of their testimony.

---

[10] Drunkenness three or four times a month; regular attendance at AA meetings; blood alcohol level of .20 at the time of the accident; delirium tremens; expert testimony.

## VIII.
### JURY INSTRUCTIONS REGARDING MR. QUALLS'S PAIN AND SUFFERING

Vanderbilt also complains that the trial court improperly instructed the jury concerning mental and emotional pain and suffering because Mr. Qualls's conservator presented no proof of emotional or mental injury. Whether this instruction was proper is a question of law and the standard of review is *de novo* with no presumption of correctness. Several experts testified that Mr. Qualls was aware that he was suffocating. This evidence, without more, justifies the pattern charge. *See, Overstreet v. Shoney's Inc.*, 4 S.W.3d at 715.

Vanderbilt also argues that the trial court erred by failing to give Tennessee Pattern Jury Instruction 14.17 regarding negligent infliction of severe or serious emotional injury. This instruction contemplates a case where a plaintiff was involved in an incident and suffered emotional injuries only. Vanderbilt did not request the proposed instruction. "Omission of a jury instruction may not be the basis of an appeal where the record does not show that the person alleging error has pointed out the omission to the trial judge by an appropriate request for the instruction." *Emery v. Southern Ry. Co.*, 866 S.W.2d 557, 564 (Tenn. Ct. App. 1993). It is the threshold duty of a party alleging error in the omission of a specific instruction to demonstrate that a correct and complete request for such instruction was submitted to, and refused by, the trial judge. *England v. Burns Stone Co.*, 874 S.W.2d 32, 37 (Tenn. Ct. App. 1993). This point presents no reversible error.

## IX.
### THE TRIAL COURT'S "SEPARATE INJURY" FINDING

At the close of the evidence, Mr. Qualls's conservator moved for a directed verdict. She contended that his injuries resulted solely from Vanderbilt's negligence and that the jury should not assess any percentage of fault to him. The trial court overruled the motion. After the trial court entered a judgment on the jury's verdict assessing fault to both Mr. Qualls and Vanderbilt, the conservator moved for a judgment in accordance with her earlier motion for a directed verdict. The essence of the motion was that "the jury should not have been charged on the issue of comparative fault" because Vanderbilt created a separate, subsequent, and distinct injury completely apart from any initial negligence on Mr. Qualls's part.

Ultimately, the trial court agreed. "[A]lthough the first injury [the car accident] is what caused [p]laintiff to be in the hospital," wrote the court, "the catastrophic injury to [the p]laintiff was the result of [the d]efendant's malpractice, and it was unrelated to the separate first injury . . .." Citing *Gray v. Ford Motor Co.*, 914 S.W.2d 464 (Tenn. 1996), the trial court granted Mr. Qualls's motion, set aside the jury's apportionment of fault, and gave the conservator judgment for "the amount in full awarded by the jury . . . $7,366,000." Vanderbilt appeals on this point, arguing that the trial court impermissibly substituted its own judgment for the considered judgment of the jury.

The trial court originally denied the plaintiff's motion for a directed verdict. That denial of a motion for directed verdict remained "subject to a later determination of the legal questions raised by the motion." *Harris v. Buckspan*, 984 S.W.2d 944, 954-55 (Tenn. Ct. App. 1998). After the trial, the trial court may enter a judgment under Tenn. R. Civ. P. 50.02 as if the plaintiff's motion for directed verdict had been granted at the close of the proof. *Wasielewski v. KMart Corp.*, 891 S.W.2d

916, 919 (Tenn. Ct. App. 1994). If the trial court amends the judgment in accordance with the motion for directed verdict, then appellate review is *de novo* with no presumption of correctness. *Brown v. Wal-Mart Discount Cities*, 12 S.W.3d 785, 787 (Tenn. 2000).

A plaintiff whose negligence is less than that of a negligent defendant may recover damages in an amount reduced in proportion to the plaintiff's own negligence. *McIntyre v. Balentine*, 833 S.W.2d 52, 57 (Tenn. 1992). It is the fact-finder's role to decide on and quantify the fault of the parties. *Prince ex rel. Bolton v. St. Thomas Hosp.*, 945 S.W.2d 731, 736 (Tenn. Ct. App. 1996). In jury cases involving comparative fault, the trial court's role as thirteenth juror is to grant a new trial if the verdict is contrary to the weight of the evidence. The trial court cannot as thirteenth juror reallocate comparative fault as a matter of weighing the factual evidence. *Turner v. Jordan*, 957 S.W.2d 815, 824 (Tenn. 1997); *Grandstaff v. Hawks*, 36 S.W.3d 482, 498 (Tenn. Ct. App. 2000). At the same time, trial courts may enter judgment notwithstanding the verdict where a jury's verdict rests on an error of law.

Mr. Qualls's conservator argued that, "[w]hether or not comparative fault principles apply in any given case is a question of law for the court." In the conservator's words, "[T]his court must now decide whether as a matter of law this was an appropriate case for the jury to apportion fault. If this court finds as a matter of law that the jury should not have been allowed to apportion fault, then the court must enter a judgment in accordance with the plaintiff's motion for a directed verdict." The conservator's post-trial motion reiterated the same argument more thoroughly -- that the nature of Mr. Qualls's injuries made it improper for the fact-finder to compare his initial fault with the subsequent fault of Vanderbilt. On re-examining this issue, the trial court implicitly found that the medical center's malpractice constituted a separate injury as a matter of law.

As a legal matter, an indivisible injury results when two or more causes combine to produce a single injury incapable of apportionment on any reasonable basis between or among the events that gave rise to it, where all those events factored in bringing about the harm. *Tracy v. Cottrell*, 524 S.E.2d 879, 895-96 (W. Va. 1999). In contrast, courts will find that injuries are divisible and separate where concurring acts of independent origin cause distinct injuries traceable back by reasonable means to more than one underlying event. Fowler V. Harper, *et al.*, *The Law of Torts* § 10.1 at 5 (2nd ed. 1986); Restatement (Second) of Torts §§ 443A and 881 (1979).

Two cases serve to illustrate the legal concept of distinct and separate injuries in tort. In *Said v. Assaad*, 735 N.Y.S.2d 265 (App. Div. 2001), a minor was injured in a two-vehicle collision, where one vehicle was equipped with an after-market snowplow attachment. The plaintiff's evidence showed that during the collision a heavy hydraulic cylinder came loose from the snowplow attachment and struck the boy's head, injuring his brain and that also a lower part of the attachment struck the boy's hip and leg, injuring them. *Said v. Assaad*, 735 N.Y.S.2d at 267. The court found that the two injuries -- to the brain and to the hip and leg -- "could be differentiated with respect to their causation" and thus were separate and distinct from each other for purposes of legal analysis. *Said v. Assaad*, 735 N.Y.S.2d at 267-69.

Similarly, in *Batson v. South La. Med. Ctr.*, 750 So.2d 949 (La. 1999), a woman was admitted to a hospital for a bleeding ulcer. She was operated on but given no antibiotics post-surgery to prevent her from developing an infection. She developed blood poisoning and respiratory

problems necessitating her placement in intensive care, where she remained for over six months, during which time she developed severe bed sores requiring pigskin grafting, leaving her severely scarred. She also lost some use of her lower extremities, developed hearing loss, had brain injury, and was left with urinary incontinence. *Batson v. South La. Med. Ctr.*, 750 So.2d at 951. The medical center argued that the plaintiff's injuries were not separable or distinct. The Louisiana Supreme Court disagreed, saying that the evidence showed that the blood poisoning had not caused the bed sores or the plaintiff's loss of use of her lower extremities. The court found that there existed at least three separable injuries traceable to different actions on the defendant's part. *Batson v. South La. Med. Ctr.*, 750 So.2d at 954-55. These cases, plus at least one other, *Fritts v. McKinne*, 934 P.2d 371 (Okla. Ct. App. 1996),[11] relied on by the trial court in granting the conservator's Tenn. R. Civ. P. 50.02 motion, do not support a finding in this case that Mr. Qualls suffered multiple, separate injuries as a matter of law.

Our review of this case shows these facts. Mr. Qualls was a chronic alcoholic. He was legally intoxicated when he drove his vehicle into a tree. The crash caused massive injuries that required immediate hospitalization. Upon arrival at Vanderbilt, it was determined that Mr. Qualls's injuries were life-threatening and required that he be placed in the neurointensive care unit. He had suffered fractures to almost every bone in his mid-face, including the bones around his eyes, the cheek bones, and his jaw. The fractures were so severe that his face and skull had separated. It was also determined that Mr. Qualls had suffered a concussion. He was treated for his hemophilia and was also intubated because his airway was threatened by the severity of his facial injuries. Radiologic examinations revealed that some areas of his lungs had collapsed and that he also had blood and fluid in his lungs.

It is undisputed that Vanderbilt physicians and nurses were treating Mr. Qualls for those initial injuries when he was taken to the CT scanner for the purpose of obtaining a more precise view of his orbital bones to facilitate surgical correction. Dr. Van Natta, Mr. Qualls's treating physician, testified that his acute intoxication on the evening of the accident and his alcohol withdrawal were substantial factors leading to his brain injury. Three days later, Mr. Qualls was receiving pain medications (fentanyl and valium), as well as anxiolytic (anxiety-relieving) and anti-psychotic medications (haldol and thorazine). The evidence revealed that haldol and thorazine, while necessary to protect Mr. Qualls from himself, can cause heart rhythm abnormalities. Dr. Van Natta testified that a normal patient in significant pain would receive approximately 50 to 100 milligrams of valium in a 24-hour period. Mr. Qualls received 960 milligrams of valium alone, aside from all his other medications, in the 24 hours prior to the event in the CT suite.

---

[11]*Fritts v. McKinne* involved facts both similar and completely different from this case. We note that the court said,

> The fact of the automobile collision was certainly relevant -- but the cause of that collision was not. Where alcohol was not a factor in the medical treatment, the fact that Fritts' injury may have been caused by his consumption of alcohol simply has no material bearing whatsoever on whether his eventual death was the result of negligent treatment by Dr. McKinne.

*Fritts v. McKinne*, 934 P.2d at 376. In this case, the evidence showed that Mr. Qualls's ingestion of alcohol turned out to be a *major* factor in his hospital treatment.

Dr. Van Natta explained the causal connection between the accident, Mr. Qualls' intoxication, and his later D.T.'s as follows:

> Q. Dr. Van Natta, do you have an opinion as to whether Mr. Qualls' intoxication and later alcohol withdrawal were substantial factors in what happened on the evening of June 2, 1998?
>
> A. Yes.
>
> Q. And what's that opinion?
>
> A. If he had not had this severe agitation that I think relates to that, he wouldn't have required all of the medications. It may have been we could have, you know, reasoned with him and he could have held still, if, in fact, medication had something to do with what happened. I think there is no way you can separate his alcohol withdrawal and his agitation from the ultimate outcome, because that affected every stage of our treatment.
>
> Q. Doctor, was it more hazardous to him than it would be to a patient with the same injuries but without the acute intoxication and the alcohol withdrawal?
>
> A. To go for the scan? Yes, to –
>
> Q. No, no. Was it more dangerous, was his -- was there more danger to him because of his intoxication, alcohol withdrawal --
>
> A. Oh, yeah.
>
> Q. -- than to someone without those problems.
> A. Yeah.

When questioned further, Dr. Van Natta testified that Mr. Qualls's alcohol withdrawal was "a contributing factor" to his resulting brain damage and succinctly explained the link: "He drove his car while he was intoxicated, he got in an accident, he aspirated blood, he had to have a tracheostomy, he was on a ventilator. All this stuff is pertinent and contributes." Finally, Dr. Van Natta concluded,

> It – it [the alcohol withdrawal] made him have less reserve for whatever it was that happened. Someone else may tolerate an event longer and not have it – you know, bradycardia and CPR. Because of his alcohol withdrawal, he had multiple medications, all of which

have cardiovascular side effects. And because he had the withdrawal syndrome, we treated him with all of this.

All of this put him at more risk for having a major catastrophe with even a relatively minor drop in his oxygen saturation. It did add more danger to him.

We find that Mr. Qualls's conservator failed to establish as a matter of law that Mr. Qualls's conduct and Vanderbilt's acts resulted in multiple, separate injuries. Accordingly, the jury properly compared the respective fault of the parties, and the trial court erred by subsequently reallocating fault. On remand, this case is to be tried as a comparative fault case. Unless the evidence materially changes, the trial court should not grant Mr. Qualls's conservator a directed verdict on a theory that Mr. Qualls suffered a separate, distinct injury at the hands of the medical center.

## X.

The trial court's numerous errors in this case unfairly undermined Vanderbilt's ability to present its case to the jury. The cumulative effect of these errors was not harmless. For that reason, we reverse the judgment and remand the case for a new trial and other proceedings consistent with this opinion. We tax the costs of this appeal to Sally Qualls Mercer for which execution, if necessary, may issue.

PER CURIAM